

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1736-09

### STATE OF TEXAS

### v.

### CHRISTI LYNN JOHNSTON, Appellee

### ON STATE'S AND APPELLEE'S
### PETITIONS FOR DISCRETIONARY REVIEW
### FROM THE SECOND COURT OF APPEALS TARRANT COUNTY

KEASLER, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, WOMACK, HERVEY, and COCHRAN, JJ., join. JOHNSON, J., filed a concurring opinion. PRICE, J., concurred.

### O P I N I O N

The court of appeals held that the unrecorded compelled draw of Christi Lynn Johnston's blood by a police officer, who was also a seasoned EMS provider, in the police station's blood-draw room while Johnston was restrained violated the Fourth Amendment's reasonable manner requirement.[1] Under the facts here, which demonstrate that the test

---

[1] *State v. Johnston*, 305 S.W.3d 746, 759-60 (Tex. App.—Fort Worth 2009).

chosen was reasonable and that it was performed in a reasonable manner, we disagree. We reverse the court of appeals's judgment and remand this case to the trial court.

## I. Background

Officers Britt Stinson and Darren Burkhart completed the Dalworthington Gardens Police Department's driving-while-intoxicated (DWI) blood-draw certification program. Dr. Joe Del Principe, an emergency room doctor at Arlington Memorial Hospital, developed and instituted the program. Dr. Del Principe certified Officers Stinson and Burkhart as venipuncture technicians.

After Officer Stinson arrested Johnston for DWI and took her to the Dalworthington Gardens Police Station, he and Officer Burkhart obtained a warrant to draw Johnston's blood. When the officers presented Johnston with the warrant and explained what was going to happen, she began to resist by kicking her feet and moving her arms. The officers restrained Johnston's feet and left arm with "Kerlix" gauze. Officer Stinson held down Johnston's right arm while Officer Burkhart drew blood from a vein in Johnston's right wrist.

The State charged Johnston with DWI. Johnston filed a pretrial motion to suppress the blood-test results, arguing that the blood draw conducted by a police officer at the police station violated her statutory and constitutional rights. The trial judge held a hearing on Johnston's motion. Dr. Del Principe and Officers Burkhart and Stinson testified.

### A. Dr. Del Principe

Dr. Del Principe testified that, in addition to his position as an emergency room (ER)

doctor, which he has held for the past twenty-two or twenty-three years, he chairs Arlington Memorial Hospital's Department of Emergency Medicine and serves as the Medical Director for Dalworthington Gardens Emergency Services Department. Dr. Del Principe has performed thousands of blood draws during his career and has trained emergency medical technicians (EMTs), nurses, residents, and interns to draw blood throughout his career.

Upon request, Dr. Del Principe developed the DWI blood-draw program for the Dalworthington Gardens Police Department. Dr. Del Principe believed the program would be helpful so officers could avoid long waiting periods at the hospital to get blood drawn from DWI suspects. He used a Phoenix, Arizona course as a model, modifying it some, to train police officers to perform venipuncture blood draws. The fourteen-hour course included classroom instruction, homework, with assigned reading materials, and graded exams. After the officers completed the fourteen-hour course, Dr. Del Principe required them to do a minimum of fifty "sticks" at the ER under the supervision of either a blood technician or nurse. Dr. Del Principe testified that he trained the officers to perform venipunctures according to accepted medical practice and that the course minimized any unjustified risk. The training that the officers received was equivalent to the training that Dr. Del Principe would give to the Hospital's blood-draw technicians. Dr. Del Principe certified the officers to perform venipuncture blood draws upon completion of all of the course requisites. He also instituted a bi-annual re-certification course.

Dr. Del Principe did not subject the course to any type of peer review. And Dr. Del

Principe stated that he never submitted the curriculum for approval by the Texas Commission on Law Enforcement Standards and Education (TCLEOSE).

Dr. Del Principe established a blood-draw room at the police department. He described the room as clean but not sterile, stating that a sterile environment, like that of an operating room, is not required. The cement floor could be cleaned easily in the event of a blood spill. The room also contained a phlebotomy chair and a steel table, both of which were non-porous and could be cleaned with commercial sanitizer before each use. Dr. Del Principe did not know whether the room would meet Occupation Safety and Health Administration (OSHA) standards.

Dr. Del Principe also developed two blood-draw checklists for the officers to adhere to when drawing a suspect's blood. The checklists were designed to ensure that the officers follow Dr. Del Principe's strict protocol. Dr. Del Principe stated that he had not yet developed a policy for instances in which a suspect resists or fights the officers. Dr. Del Principe believed that, when officers are unable to safely obtain a sample at the police station, they would bring the suspect to the hospital where the suspect is would then be secured before blood is drawn. Dr. Del Principe opined that any certified officer would be qualified to draw blood in the station's blood-draw room from a suspect who resists or fights. He also stated that, based on his personal experience, forcibly taking blood from a suspect is acceptable. Dr. Del Principe explained that he instructed the officers to go to the hospital if they get stuck by a needle.

Dr. Del Principe also testified that he educated the officers about how certain medications and medical conditions may affect venipuncture blood draws. For example, drawing blood from the arm of a person who had a mastectomy and a lymph node removed could be problematic. It can also make a difference if a person is taking blood thinners. Dr. Del Principe stated that although the blood-draw checklists did not itemize any preliminary inquiry into a DWI suspect's medical history, he taught the officers to make such an inquiry when they make an arrest or when the person enters the police station. He stated that he instructed the station's employees to ask an individual whether he or she has any medical problems, like diabetes, when they enter the facility. And they were instructed to ask an individual whether he or she takes high blood pressure medication or blood thinners. Comparing the procedure for DWI blood draws performed at Arlington Memorial Hospital, Dr. Del Principe stated that he did not know whether suspects fill out any medical history form, but he stated that they do not see a doctor.

Dr. Del Principe testified about the general risks and dangers associated with venipuncture blood draws. A hematoma, which is a collection of blood, may develop at the punctured site but it is "very common" and "not a serious thing." It is also possible to puncture an artery, which is remedied by applying pressure until the blood clots. It is also possible to stick a nerve, causing immediate pain that may, depending on the case, be excruciating. There is also the potential for causing long-term nerve damage. With respect to the Dalworthington Gardens program, Dr. Del Principe testified he has not received any

report of a hematoma or a nerve stick.

Dr. Del Principe stated that Officer Burkhart completed the course, receiving a ninety percent or above on the exams, but was exempted from doing the fifty sticks because of Officer Burkhart's experience in drawing blood as an EMT. Officer Burkhart would also be exempt from the two-year re-certification course because of his continued work as an EMT. Dr. Del Principe stated that he had not personally observed Officer Burkhart start an intravenous line (IV) or draw blood, but he had been in the ER when Officer Burkhart brought in a patient with an IV; he never noted any particular problems with an IV started by Officer Burkhart. Dr. Del Principe described Officer Burkhart as being "exceptional" at performing venipuncture and believed that Officer Burkhart had as much training and experience drawing blood as the Hospital's blood technician.

**B. Officer Burkhart**

At the time of the hearing, Officer Burkhart had been a EMT for sixteen years and had six years of training as a police officer. He was currently employed as a firefighter and EMT, not as a police officer. When he drew Johnston's blood, he was certified as an "intermediate EMT." Approximately forty hours of the class-time towards that certification was devoted to the use of needles, venipuncture blood draws, and IVs. He can start IVs, which requires inserting a needle into a vein, intubate patients, provide basic life support, and administer certain drugs. He testified that he has performed venipunctures thousands of times.

Recalling Dr. Del Principe's course, Officer Burkhart stated:

> It was how to properly obtain blood using venipuncture with extremities only, which is the upper extremities from your shoulder down to your fingertips. The proper way of cleaning the site, the proper way of inserting the needle, the proper way of withdrawing blood, and . . . if there's any bleeding, what you do to stop the bleeding.

Dr. Del Principe also educated them about the anatomy of the upper extremities.

Officer Burkhart testified that he cleaned the blood-draw room at the start of his shift and again after each time he used the room to draw a suspect's blood. When he drew Johnston's blood, he followed the acceptable medical practices that he learned from Dr. Del Principe and as an EMT:

> Well, first, when we restrained her, we restrained her to protect her from hurting herself or ourselves [sic]. Once she calmed down and we were able to draw the blood, I drew it correctly without, you know, jabbing the needle in, doing anything that's going to harm her. I did it by what is technically correct and a safe way of drawing blood from her.

He also explained, in detail, the routine manner in which he draws blood from DWI suspects:

> Once we determine a site, we apply a tourniquet. We look for the area where we're going to draw the blood from a vein. Once the area is located, you use Betadine because you cannot use alcohol. We clean the site with Betadine. From there we take a needle with a tube holder and a tube, and we inject the needle into the – – or I'm sorry. Place the needle into a vein. We fill up an evidence tube or vacuum tube, to withdraw the blood. Once the tube's filled up, we take the needle out, the tube out. We mix the tube so that – – there's an anti-coagulant powder that's in there – – the blood doesn't clump together, twist – – however you want to say – – stir or twist the tube so the powder gets into the blood so it doesn't clot. Release the tourniquet, and then if there's any bleeding, hold her at – – pressure until the bleeding is stopped and then place a Band-aid on it.

Johnston did not make any complaints about the way that the blood had been drawn.

Only a "little bit of bleeding" came from the puncture site after the draw, and Officer

Burkhart did not see any evidence of internal bleeding at that time.

Johnston's attorney questioned Officer Burkhart in detail about the blood draw. He asked Officer Burkhart if getting "a little" medical history before drawing blood is appropriate medical protocol. Officer Burkhart stated, "Not necessarily." He then stated that an inquiry into a person's medical history "is important under different circumstances." When asked if he makes a medical history inquiry before performing a venipuncture during his work as an EMT, Officer Burkhart stated that it "depends on the situation."

Officer Burkhart testified that he did not know whether Johnston was on blood thinners at the time he drew her blood. And he testified that it would have been "important" for him to know if she had had a mastectomy and a lymph node removed from her arm; he did not know whether Johnston had undergone such procedures. Officer Burkhart maintained that it is possible that Johnston may have had some medical condition that he did not know about that could have affected her health when he drew her blood.

Officer Burkhart did not check on Johnston after drawing her blood. He did not know whether any bruising from the needle or internal bleeding from the vein had developed.

**C.  Officer Stinson**

Officer Stinson testified that, at the time of the draw, he was certified as a "basic EMT." He had also completed Dr. Del Principe's course. He had performed approximately 125 to 130 blood draws and had observed around 150. Officer Stinson stated that there was not a protocol in place for DWI suspects who "fight" in the blood-draw room. The general

protocol when a suspect fights with a police officer, however, is to use as little force as possible to restrain the suspect.

Johnston had started the "basic book-in" procedures at the jail before the blood draw. According to Officer Stinson, jail personnel take a full medical history when a person is booked into the jail. Officer Stinson stated that there was a "medical history on [Johnston]" before the blood draw. But Officer Stinson never reviewed it. He also admitted that he did not know if Johnston was taking blood thinners.

Officer Stinson assisted Officer Burkhart in drawing Johnston's blood. The phlebotomy chair was disinfected before the draw. He helped restrain Johnston in the chair so Officer Burkhart could safely draw her blood. Johnston was cooperative after being restrained. Officer Stinson testified that Officer Burkhart followed the "recognized medical procedure" when drawing Johnston's blood. Officer Burkhart used a latex tourniquet. Officer Stinson stated that he did not know whether Johnston is allergic to latex. Officer Stinson also did not know whether Johnston had any bruising from the draw; he did not check on her after the draw to see how she was doing.

### D. Trial Judge's Ruling

The trial judge granted Johnston's motion to suppress. The judge determined that the three witnesses were credible and reliable. Among other things, in his finding of fact, the trial judge found that Officers Burkhart and Stinson "followed medically accepted procedures in drawing blood" and that the clean-room checklist "follows medically accepted

procedures" that were used in this case. The judge determined that Section 724.017 of the Transportation Code applies to all blood draws. Applying Section 724.017 of the Texas Transportation Code, the judge concluded that an individual who completes Dr. Del Principe's course is not a qualified technician within the meaning of the Code.

Considering federal constitutional law, the judge concluded that under the Supreme Court's opinion in *Schmerber v. California*,[2] the blood draw violated the Fourth Amendment's reasonable manner requirement because it was not drawn by medical personnel in a hospital or medical environment. Therefore, the blood-test results were inadmissible as a matter of law.

## II. Court of Appeals

The State appealed the trial judge's ruling.[3] The Fort Worth Court of Appeals determined that the proper inquiry, for purposes of the Fourth Amendment, requires a de novo review of whether the draw was performed in a reasonable manner.[4] The court rejected the trial judge's determination that *Schmerber* requires blood to be drawn by a medical professional in a hospital or medical environment.[5] The court assumed, for purposes

---

[2] 384 U.S. 757, 771-72 (1966).

[3] *Johnston*, 305 S.W.3d at 748.

[4] *Id.* at 752.

[5] *Id.* at 759.

of its analysis, that Officer Burkhart was qualified to draw Johnston's blood.[6] Evaluating the environment, the court observed that other jurisdictions do not apply such a narrow reading of *Schmerber*.[7] Blood draws conducted in police departments and jails have been held to be reasonable.[8] Thus, the court concluded that there was nothing inherently unsafe (i.e., unreasonable) about the room in which Johnston's blood was drawn.[9]

However, the court concluded that it was "troubled" by "other circumstances surrounding the blood draw"—that neither Officers Burkhart nor Stinson asked Johnston for a general medical history when Dr. Del Principe testified that he instructed the officers to make such an inquiry and that the officers' adherence to his protocol was important.[10] The court went on to state that the trial judge, viewing the totality of the circumstances, could have determined that the officers' failure to ask Johnston about her general medical history

---

[6] *Id.* at 760 n.14.

[7] *Id.* at 759 (citing *State v. May*, 112 P.3d 39, 41-42 (Ariz. Ct. App. 2005); *Moore v. State*, 915 S.W.2d 284, 290-91 (Ark. 1996); *People v. Mari*, 528 P.2d 917, 918 (Colo. 1974); *State v. Cardona*, No. CRIM. A. IN08-05-1015-18, 2008 Del. Super. LEXIS 414 (Del. Super. Dec. 3, 2008) (mem. op.); *State v. Davis*, 207 P.3d 281, 286 (Kan. Ct. App. 2009); *State v. Sickler*, 488 N.W.2d 70, 73-74 (S.D. 1992); *State v. Mason*, No. 02C-01-9310-CC-00233, 1996 Tenn. Crim. App. LEXIS 163 (Tenn. Crim. App. Mar. 13, 1996) (not designated for publication); *State v. Daggett*, 640 N.W.2d 546, 548-51, *review denied*, 643 N.W.2d 96; *see also People v. Esayian*, 5 Cal. Rptr. 3d 542, 545-46, 549-50 (Cal. Ct. App. 2003); *cf. Garcia v. State*, 112 S.W.3d 839, 848-49 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

[8] *Id.*

[9] *Id.*

[10] *Id.* at 760.

and to follow-up on her condition "subjected [Johnston] to an unjustified risk of medical harm, thus making the blood draw unreasonable under the Fourth Amendment . . . ."[11] Continuing, the court observed that additional circumstances surrounding the blood draw made it even "more troubling": (1) that it was conducted in the privacy of a police station and was not recorded, even though the station had recording equipment; (2) that Johnston was alone with two officers, including Officer Stinson, who had arrested her; (3) that Johnston was restrained; and (4) that the department did not have any guidelines for the use of force during DWI blood draws.[12] The court then held that the blood draw was not reasonable and upheld the trial judge's ruling.[13] In a departing cautionary note, the court stated that its decision was based on the specific facts of the case and asserted:

> We do not intimate that the inclusion of a rudimentary question about [Johnston's] medical health or a brief follow-up on her condition after the blood draw is all that would have been required to make this blood draw reasonable, nor should our opinion be read to put a stamp of approval or disapproval on the Dalworthington Gardens blood draw program in general.[14]

### III. Petitions for Discretionary Review

The State petitioned us for review, raising several complaints about the court of appeals's application of established standards of review. First, the State claims that the court

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.* at 761.

improperly disregarded, and failed to defer to, the trial judge's finding of fact that the blood draw was conducted in accordance with medically accepted procedures. Second, the State contends that the court improperly shifted the burden of proof to the State. As a warrant-based search and seizure, the burden shifted to Johnston to prove that it was unreasonable, and the record here does not support a determination that the blood draw was unreasonable. Third, the State complains that the court misapplied the totality-of-the-circumstances standard of review. "The Court's narrow interpretation of a few facts, namely medical history testimony, undeveloped discussions of video capabilities, and the unsubstantiated need for the officers' to provide follow-up care to [Johnston] turns the totality-of-the-circumstances approach up-side-down."

Johnston filed a cross-petition for discretionary review. She argues that our Legislature has established procedures for blood draws in the Transportation Code and contends that those procedures should be regarded as the bare-minimum safeguards for purposes of the Fourth Amendment. Because Officer Burkhart was not qualified to draw blood by statute, we should hold that he is not "medical personnel" as contemplated by the Supreme Court in *Schmerber*. Johnston also takes issue with the court of appeals's determination that *Schmerber* is not a per se bar prohibiting law enforcement officers from drawing a DWI suspect's blood.

Because of the importance of these issues to the jurisprudence of this State, we granted both parties' petitions.

## IV. Law

When reviewing a trial judge's ruling on a motion to suppress, we view all of the evidence in the light most favorable to the trial judge's ruling.[15] We afford almost total deference to a trial judge's determination of historical facts when they are supported by the record.[16] The prevailing party is entitled to "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence."[17] We also afford almost total deference to the trial judge's rulings on mixed questions of law and fact when the resolution of those questions depends upon an evaluation of credibility and demeanor.[18] We review de novo mixed questions of law and fact that do not depend on an evaluation of credibility and demeanor.[19] All purely legal questions are reviewed de novo.[20]

*Schmerber v. California* is the landmark case addressing the constitutionality of compulsory blood draws conducted for law-enforcement purposes under the Fourth Amendment. After Schmerber was injured in an automobile accident, police arrested him

---

[15] *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007).

[16] *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[17] *Garcia-Cantu*, 253 S.W.3d at 241.

[18] *Guzman*, 955 S.W.2d at 89.

[19] *Id.*

[20] *Kothe v. State*, 152 S.W.3d 54, 62-63 (Tex. Crim. App. 2004).

at the hospital while he was being treated for his injuries.[21] The police directed a physician to draw a sample of Schmerber's blood.[22] The blood-test results showed that Schmerber was intoxicated at the time of the accident.[23] At trial, Schmerber contested the admissibility of the test results, contending that the blood draw violated his Fourth Amendment rights.[24] Schmerber was later convicted of driving while intoxicated.[25]

The Supreme Court held that the warrantless blood draw constituted a search and seizure under the Fourth Amendment.[26] The Court then determined that the relevant two-part analysis for determining the legality of a blood draw is:

> (1) "whether the police were justified in requiring [Schmerber] to submit to a blood test;" and,

> (2) "whether the means and procedures employed in taking [Schmerber's] blood respected relevant Fourth Amendment standards of reasonableness."[27]

The second part of the analysis contains two discrete questions: first, to resolve the reasonableness of the "means" employed, it must be determined whether the test chosen was

---

[21] *Schmerber*, 384 U.S. at 758.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.* at 767.

[27] *Id.* at 768.

reasonable;[28] and second, to resolve the reasonableness of the "procedures" employed, it must be determined whether "the test was performed in a reasonable manner."[29]

Based on the evidence, the court determined that the police had probable cause to obtain a sample of Schmerber's blood without a warrant.[30] Thus, the first issue was satisfied; the police were justified in taking Schmerber's blood.[31]

Then, considering the first part of the second reasonableness question, the Court held that the test chosen was reasonable.[32] Blood tests are "a highly effective means of determining the degree to which a person is under the influence of alcohol."[33] Additionally, blood "tests are a commonplace in these days of periodic physical examinations and experience teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain."[34] Schmerber, the Court held, in the absence of any contrary evidence in the record, "is not one of the few who on the grounds of fear, concern for health, or religious scruple might prefer some other means of testing . .

---

[28] *Id*. at 771.

[29] *Id*. at 771.

[30] *Id*. at 768-70.

[31] *Id*.

[32] *Id*. at 771.

[33] *Id*.

[34] *Id*.

. ."[35]  Therefore, the Court declined to decide whether "such wishes would have to be respected."[36]

Finally, based on the record, the Court concluded that the blood draw "was performed in a reasonable manner" because Schmerber's blood was drawn by a physician in a hospital according to acceptable medical practice.[37]  The Court then stated:

> We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even the most rudimentary sort, were made by other than medical personnel or in other than a medical environment — for example, if it were administered by police in the privacy of the stationhouse.  To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection or pain.[38]

## V.  Analysis

### A.  Reasonableness of Test Chosen

At the outset, we need to make clear that it is necessary to consider both reasonableness questions under *Schmerber*: first, whether the test chosen was reasonable; and second, whether it was performed in a reasonable manner.  The issue, because of the court of appeals's decision, involves more than a consideration of the second reasonableness question, which the court of appeals viewed as dispositive in affirming the trial judge's ruling.  The court of appeals erred to overlook *Schmerber*'s first reasonableness question

---

[35]  *Id.*

[36]  *Id.*

[37]  *Id.*

[38]  *Id.* at 771-72.

when it stated that the trial judge could have held that the blood draw was performed in an unreasonable manner because the officers failed to make a general inquiry into Johnston's medical history before the draw, as Dr. Del Principe trained them to do, and the officers' failure to follow up on Johnston's condition after the draw.

Our reading of *Schmerber*, however, establishes that the issue of an individual's particular medical condition falls within the scope of the first reasonableness question: whether the test chosen was reasonable. And for the general population, the Supreme Court has determined that a blood test is a reasonable means in which to analyze an individual's blood alcohol level.[39] "[T]he quantity of blood is minimal, and . . . for most people the procedure involves virtually no risk, trauma, or pain."[40] The use of a blood test, versus another means of testing, might be deemed unreasonable in only a minority of cases—when "the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing . . . ."[41]

Here, the court of appeals was incorrect to conclude that the officers' failure to inquire into Johnston's medical history and follow up on her condition subjected Johnston to an unjustified risk of medical harm, thereby supporting a ruling that the draw was

---

[39] *Id.* at 771; *see also Breithaupt v. Abram*, 352 U.S. 432, 435 (1957) (stating that there is nothing brutal or offensive when an emergency room physician takes a blood sample from an unconscious suspect to obtain the suspect's blood alcohol level).

[40] *Schmerber*, 384 U.S. at 771.

[41] *Id.*

unreasonable. The Supreme Court has taken into account the existence of specific medical conditions that may create an unjustified risk, trauma, or pain in ruling that blood-draw tests, when used on the general population, are reasonable. So there is a presumption that venipuncture blood-draw tests are reasonable under the Fourth Amendment, despite recognized medical anomalies and exceptions that may render the administration of such a test unreasonable. Thus, the failure to make an inquiry into an individual's medical history before drawing blood and to conduct a follow up examination does not render blood draws per se unreasonable, as the court of appeals intimated.

Implicit within *Schmerber* is that each suspect bears the burden of showing that a venipuncture blood draw is not a reasonable means to obtain a blood alcohol level assessment as to him or her, individually.[42] And in the absence of any record evidence showing that a venipuncture blood draw would not be reasonable in a particular case due to a verifiable medical condition, we will presume that the choice to administer such a test is reasonable. A DWI suspect, naturally familiar with his or her own medical history, is in the best position to identify and disclose any peculiar medical condition that could result in risk, trauma, or more than de minimus pain if a blood draw were to be performed.

In this case, as in *Schmerber*, there is no evidence in the record that Johnston suffers from a medical condition that would have made another means of testing preferable. Consequently, we do not need to consider whether law enforcement officials would have to

---

[42] *See id.*

grant a suspect's request for a different means of testing. The presumption therefore stands that the venipuncture blood test chosen here as a way to measure Johnston's blood alcohol level was reasonable.

On a final note, it is evident that the court of appeals's concern for the well-being and safety of DWI suspects was a crucial factor in its decision-making. These are weighty concerns that should not be marginalized. But we are confident that law enforcement officials will be deliberate and conscientious when choosing the type of test to administer to obtain a suspect's blood alcohol level.[43] Additionally, the prospect of a costly civil rights suit[44] presents a strong deterrent that should prevent officials from choosing to perform a venipuncture blood draw when the procedure could involve "risk, trauma, or pain" to a suspect.[45]

## B. Reasonableness of Manner of Performance

We now turn to the court of appeals's resolution of *Schmerber*'s second reasonableness question—whether the blood test was performed in a reasonable manner.

### 1. Applicability of the Texas Transportation Code

We begin by addressing Johnston's contention that the Transportation Code provides

---

[43] *See Hudson v. Michigan*, 547 U.S. 586, 599 (2006) ("we now have increasing evidence that police forces across the United States take the constitutional rights of citizens seriously.").

[44] *See id.* 597-98.

[45] *Schmerber*, 384 U.S. at 771; *see also Winston v. Lee*, 470 U.S. 753, 761 (1985) ("a search . . . may be unjustifiable if it endangers the life or health of the suspect.").

the minimum requirements or safeguards for blood draws in assessing the reasonableness of how the draw was performed under the Fourth Amendment. Chapter 724 of the Texas Transportation Code, which contains Texas' implied consent statutes, governs the State's ability to obtain a breath or blood sample from a DWI suspect when there is no warrant.[46] Under Section 724.017(a), "[o]nly a physician, qualified technician, chemist, registered, or licensed vocational nurse may take a blood specimen at the request or order of a peace officer under this chapter. The blood specimen must be taken in a sanitary place."[47]

The court of appeals, addressing the trial judge's use of Chapter 724 to resolve *Schmerber*'s reasonableness questions, held that Chapter 724 does not provide greater protection than the Fourth Amendment and offers only one method of conducting a blood draw that would be deemed reasonable under the Fourth Amendment.[48] However, the court stated that the failure to comply with Chapter 724 does not dictate what is reasonable under the Fourth Amendment; another method of obtaining a blood specimen may be reasonable.[49] The court then held that reasonableness must be considered under the totality of the circumstances of the case.[50]

---

[46] *Beeman v. State*, 86 S.W.3d 613, 616 (Tex. Crim. App. 2002).

[47] TEX. TRANSP. CODE ANN. § 724.017 (Vernon 1999).

[48] *Johnston*, 305 S.W.3d at 752.

[49] *Id.*

[50] *Id.*

We agree with the court of appeals's determination that Chapter 724 is not controlling authority when it comes to determining the reasonableness of how a blood draw was performed under the Fourth Amendment. In *Beeman v. State*, we held that Chapter 724 is inapplicable when there is a warrant to draw blood; therefore, compliance with Chapter 724 is not necessary to satisfy the Fourth Amendment.[51] Whether a blood draw is conducted pursuant to a warrant or not, the assessment of reasonableness is purely a matter of Fourth Amendment law. In light of *Beeman*, the court of appeals was correct to hold that compliance with Section 724.017 would provide one way to establish reasonableness under the Fourth Amendment. But Section 724.017 in no way provides the exclusive means for establishing reasonableness.

We also agree with the court of appeals that it is appropriate to invoke traditional Fourth Amendment principles to determine whether a blood draw was performed in a reasonable manner. Accordingly, the reasonableness of the manner in which a DWI suspect's blood is drawn should be assayed on an objective, case-by-case basis in light of the totality of the circumstances surrounding the draw.[52]

---

[51] 86 S.W.3d at 616.

[52] *Cf. Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009) ("The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer . . . and it requires a consideration of the totality of the circumstances facing the arresting officer . . . ."); *Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007) ("A reasonable-suspicion determination is made by considering the totality of the circumstances . . . ."); *Laney v. State*, 117 S.W.3d 854, 862 (Tex. Crim. App. 2003) ("We have used an objective standard of reasonableness in determining whether a warrantless search is justified under the Emergency Doctrine."); *Saenz v. State*, 842 S.W.2d 286, 288

### 2. Medical Personnel and Environment

We now consider Johnston's second challenge to the court of appeals's opinion—that *Schmerber* prohibits all blood draws conducted by police officers in a non-medical environment. Officers Burkhart and Stinson, Johnston contends, were acting in their capacity as peace officers, gathering evidence for a criminal investigation, and were certified under a program that has not been subjected to peer review or any external regulation. Thus, the officers were not acting as medical personnel. Further, Johnston argues that the room in which her blood was drawn does not constitute a medical environment: "[A] room inside the jail dedicated to the collection of evidence in DWI cases where the only 'medical' procedures performed are the forcible obtaining of blood samples from intoxication offense suspects does not equate, by any reasonable definition, to a 'medical environment.'"

The court of appeals assumed, without deciding, that Officer Burkhart was qualified to draw a DWI suspect's blood because of his training and experience as an EMT. The court also determined that most cases interpreting *Schmerber* have not applied such a narrow reading so as to restrict the location of blood draws to a hospital or clinic.

Because the court of appeals resolved this issue on grounds unrelated to Officer Burkhart's qualifications to draw blood, we must address his qualifications in the first instance. We decline to rely on Dr. Del Principe's DWI blood-draw certification program

(Tex. Crim. App. 1992) ("The totality of the circumstances surrounding [an investigative detention] are looked to in determining whether the police conduct was reasonable").

in deciding this issue; an opinion on the propriety of the course is not necessary given the record before us. We conclude that Officer Burkhart's specific training and experience as an EMT, presented in detail at the suppression hearing, qualified him to perform the venipuncture blood draw here.[53]

Next, regarding the environment, we agree with the court of appeals's determination that *Schmerber* does not require that compulsory blood draws be conducted in a hospital or clinic. Indeed, our own research of other jurisdictions demonstrates that courts have upheld blood draws conducted by doctors, nurses, or technicians within the confines of various law enforcement agencies.[54] An Arizona appellate court has held that blood drawn by a police officer, who received a week of phlebotomy training, from a suspect while standing behind

---

[53] *See May*, 112 P.3d at 41-42 (blood draw by police officer with a week of phlebotomy training); *see also State v. Noceo*, 221 P.3d 1036, 1040 (Az. Ct. App. 2009), *cert. denied Harris v. Arizona*, 131 S. Ct. 480 (Oct. 12, 2010) (draw inside patrol car by officer trained as phlebotomist).

[54] *See e.g., Moore*, 915 S.W.2d at 291 (physician at sheriff's office); *Esayian*, 112 Cal. App. 4th at 1040-41 (phlebotomist in detention facility); *Davis*, 207 P.3d at 284, 287 (licensed medical technologist in kitchen of sheriff's office); *Sickler*, 488 N.W.2d at 73 (nurse in jail); *State v. Lanier*, 452 N.W.2d 144, 146 (S.D. 1990) (certified medical technologist in jail); *State v. Myers*, 464 N.W.2d 608, 609 (S.D. 1990) (same); *Daggett*, 640 N.W.2d at 548, 550 (doctor in booking room); *see also Wetsch v. North Dakota Department of Transportation*, 679 N.W.2d 282, 286-87 (N.D. 2004) (a request to be taken to hospital to have blood drawn when a nurse is available to draw blood at law enforcement center and there is no other justifiable reason to refuse a blood test amounts to a refusal to provide a specimen). *But see Robinson v. State*, 308 A.2d 734, 742 (Md. Ct. Spec. App. 1973) (draw in jail by officer with no qualifications and without the assistance of a physician or medical personnel unreasonable).

a patrol car was reasonable under *Schmerber*.[55] Given the amount of comparative persuasive authority on the subject, we are not convinced that *Schmerber*'s reasonable manner requirement acts as a per se bar to blood draws conducted in a non-medical environment. Though a medical environment may be ideal, it does not mean that other settings are unreasonable under the Fourth Amendment. According to our research, reasonableness depends upon whether the environment is a safe place in which to draw blood.[56]

The environment here, according to the evidence in the record, was safe; it was in accordance with accepted medical practices and therefore did not "invite an unjustified element of personal risk of infection or pain."[57]

### 3. Additional Circumstances

Having determined that Officer Burkhart was qualified to draw Johnston's blood and that the environment in which her blood was drawn was safe, we need to evaluate the remaining circumstances surrounding the draw—how the draw was actually performed and the "more troubling circumstances" identified by the court of appeals.

In answering this issue, we agree with the State's argument that the court of appeals failed to give proper deference to the trial judge's finding that the officers "followed medically accepted procedures in drawing the blood." The record supports a finding that

---

[55] *May*, 112 P.3d at 41-42; *see also Noceo*, 221 P.3d at 1040.

[56] *See* text accompanying note 53 *supra*.

[57] *Schmerber*, 384 U.S. at 772.

both the equipment and technique used by Officer Burkhart were in accordance with acceptable medical practices.

The court of appeals found it troubling that Johnston's blood was drawn in the privacy of the police station while she was alone with two officers, one being the arresting officer, and that the draw was not recorded when recording equipment was available. In this case, we cannot see how this supports an unreasonableness determination, especially in light of the court's failure to offer any reasoning whatsoever. There is absolutely no evidence in the record that these factors subjected Johnston to any additional risk of infection and pain above and beyond those normally associated with venipuncture blood draws.

The court of appeals also found it troubling that Johnston was restrained and that Dalworthington Gardens did not have a use-of-force protocol for DWI blood draws. Again, on this record, we are inclined to disagree. The testimony at the hearing established that it is not out of the norm, even in a medical setting, to restrain a uncooperative DWI suspect in order to obtain a blood sample. And Officer Stinson testified that the department had a general use-of-force policy, which was to use only the minimum amount of force necessary. The testimony in this case is supported by our research of other jurisdictions addressing the use of force in this context. These courts have concluded that the reasonable use of physical force to obtain a blood sample is permissible.[58] The court of appeals did not conclude that

---

[58] *State v. Clary*, 2 P3d 1255, 1261 (Az. Ct. App. 2000) (restrained by several officers); *Carleton v. The Superior Court of San Diego County*, 170 Cal. App. 3d 1182, 1191-92 (Cal. App. Ct. 1985) (restrained by six people); *McCann v. State*, 588 A.2d 1100,

the officers' use of force here—strapping Johnston's legs and left arm to the phlebotomy chair with gauze and then holding Johnston's right arm down to obtain a sample—was excessive and therefore unreasonable.[59] And we reject the notion that the mere use of force, without a finding of unreasonableness, supports the conclusion that the draw was performed in an unreasonable manner.

Under the totality of the circumstances, we hold that Johnston's blood was drawn in accordance with acceptable medical practices and was therefore reasonable. The deviation of the circumstances here from those in *Schmerber* did not "invite an unjustified element of personal risk of infection or pain." The court of appeals erred to conclude otherwise.

**Conclusion**

The trial judge and the court of appeals erred to conclude that the blood draw was unreasonable under the Fourth Amendment. Therefore, the court of appeals erred to affirm the trial judge's decision to grant Johnston's motion to suppress the blood-test results. We reverse the court of appeals's judgment and remand this case to the trial court.

---

1101, 1102-03 (Del. 1991) (stun gun used on suspect's arm); *Lanier*, 452 N.W.2d at 147 (restraint by five or six officers) (citing and discussing *Hammer v. Gross*, 884 F.2d 1200, 1208 (9th Cir. 1989)); *Mason*, 1996 Tenn. Crim. App. LEXIS, at *44 (subdues by use of mace); *State v. Krause*, 484 N.W.2d 347, 349 (Wis. Ct. App. 1992) (suspect's head covered with pillow case and extremities tied); *see also Burns v. State*, 807 S.W.2d 878, 883 (Tex. App.—Corpus Christi 1991, pet. ref'd) (restraint of suspect by officers in hospital so technician could draw blood not unconstitutional).

[59] *See Graham v. Conner*, 490 U.S. 386, 388 (1989) (a civil rights claim alleging that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other seizure is analyzed under the Fourth Amendment's objective reasonableness standard).

DATE DELIVERED: March 16, 2011
PUBLISH