## COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**
### NO. 02-09-00406-CR


JAMES LEON HUDDLESTON                                   APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

FROM COUNTY CRIMINAL COURT NO. 10 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

Appellant James Leon Huddleston appeals following his guilty plea to driving while intoxicated and challenges the trial court's denial of his motion to suppress evidence. He contends in two points that the trial court abused its discretion by denying the motion to suppress because his detention was not

---

[1]*See* Tex. R. App. P. 47.4.

based on reasonable suspicion and because the manner in which the police conducted a blood draw was unreasonable. We affirm.

## II. Factual and Procedural Background

At 2:45 a.m. on July 5, 2008, the police received a concerned-citizen call about a white Ford Ranger that had been parked beside the road, with its lights on, for more than an hour. When Officer C.A. Bain arrived at the scene, he observed the white Ford Ranger on the shoulder. Officer Bain testified that he believed this was a dangerous situation because it was unusual for a vehicle to be parked in that location at that time of night and because there had been several vehicle burglaries in the area. Officer Bain approached the vehicle and noticed that the vehicle's engine was running, that its lights were on, and that the driver's side window was partially rolled down. He also discovered Huddleston asleep in the driver's seat with two beer cans within reach. Officer Bain examined the surrounding area to determine the presence of any weapons and turned the vehicle off in case Huddleston startled when waking. After waking Huddleston, Officer Bain smelled alcohol on Huddleston's breath and observed that Huddleston had bloodshot, watery eyes. Huddleston explained his location by stating that he had been called into work and was waiting for the gates to open.

Officer Bain asked Huddleston if he had been drinking, and Huddleston said that he drank two 24-ounce beers around 6:00 p.m. the previous day. Officer Bain testified that Huddleston appeared disoriented and confused about a

2

beeping sound from his vehicle.  Officer Bain then requested that Huddleston step out of the vehicle, and Huddleston stumbled when exiting.  Officer Bain requested that Huddleston perform several field sobriety tests (FST), and Huddleston illustrated multiple signs of intoxication before he refused to continue the test:  three clues on the HGN and five clues on the "walk and turn" and the "one-leg stand."  Prior to the FSTs, Huddleston informed Officer Bain of a prior back injury.

Upon completion of the FSTs, Officer Bain detained Huddleston and subsequently spoke to his mother over the phone about possible medical conditions.  Huddleston's mother confirmed the back injury but informed the officer that Huddleston had no current medical conditions that would affect an FST.  Officer Bain arrested Huddleston for driving while intoxicated.

Officer Bain transported Huddleston to the jail for a blood draw in the "intox room."  Officer Bain read Huddleston the required DIC-24 warning and requested a breath sample, and Huddleston refused the request.  Officer Bain then prepared a search warrant affidavit in order to obtain a blood sample as evidence of the crime of driving while intoxicated.  He presented the affidavit to a local magistrate, and Officer Bain took Huddleston to the intox room" after the magistrate signed the search warrant.

Officer Ben Singleton drew Huddleston's blood.  Officer Singleton testified that the "clean room" at the Fort Worth Police Department was used solely for blood draws during that weekend, that it contained a phlebotomy chair, and that it

3

was consistently cleaned with a bleach and water solution before and after each draw. He testified that he was qualified to perform venipunctures within the scope of his employment because he had completed a blood-draw training program, and he testified that he conducted Huddleston's blood draw according to his training. There is no evidence in the record establishing that Officer Singleton acquired a medical history from Huddleston.

### III. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's ruling on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

### IV. Reasonable Suspicion

Huddleston contends in his first point that the trial court abused its discretion by denying his motion to suppress because there was no reasonable suspicion to detain him. The State responds that Officer Bain's initial contact with Huddleston was a valid consensual encounter and that Huddleston's continued detention was supported by reasonable suspicion.

4

## A. Applicable Law

### 1. Consensual Encounter

The Texas Court of Criminal Appeals has recognized three categories of interactions between police officers and citizens: encounters, investigative detentions, and arrests. *State v. Perez*, 85 S.W.3d 817, 819 (Tex. Crim. App. 2002). Unlike investigative detentions and arrests, which are seizures for Fourth Amendment purposes, an encounter is a consensual interaction that the citizen is free to terminate at any time. *See Gurrola v. State*, 877 S.W.2d 300, 302–03 (Tex. Crim. App. 1994). The dispositive question is whether the totality of the circumstances shows that the police conduct at issue would have caused a reasonable person to believe that he was free to decline the officer's requests or otherwise terminate the encounter. *Florida v. Bostick*, 501 U.S. 429, 439–40, 111 S. Ct. 2382, 2389 (1991); *State v. Velasquez*, 994 S.W.2d 676, 679 (Tex. Crim. App. 1999). If a reasonable person would feel free to terminate the encounter, the police-citizen contact is merely a consensual encounter and does not implicate the Fourth Amendment. *See United States v. Drayton*, 536 U.S. 194, 201, 122 S. Ct. 2105, 2110 (2002); *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S. Ct. 1319, 1324 (1983); *Velasquez*, 994 S.W.2d at 679.

Circumstances that may indicate that a police-citizen interaction is a seizure, rather than a consensual encounter, include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or use of language or tone of voice indicating that

compliance with the officer's requests might be compelled. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980). Absent some such evidence, however, otherwise inoffensive conduct between a citizen and a police officer cannot, as a matter of law, amount to a seizure of that person. *Id.*

### 2. Reasonable Suspicion

"No bright-line rule governs when a consensual encounter becomes a seizure." *State v. Woodard*, No. PD-0828-10, 2011 WL 1261320, at *4 (Tex. Crim. App. Apr. 6, 2011). "Generally, however, when an officer through force or a showing of authority restrains a citizen's liberty, the encounter is no longer consensual." *Id.* "This is the point at which an encounter becomes a detention or arrest, both of which are seizures under the Fourth Amendment." *Id.* "Thus, Fourth Amendment scrutiny becomes necessary." *Id.*

A temporary investigative detention is permissible provided the officer has a reasonable suspicion that the individual has engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968). Reasonable suspicion exists when an officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him reasonably to conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

### B. Discussion

In *State v. Priddy*, this court reversed a trial court's grant of a motion to suppress and held that the police officer's initial encounter with Priddy was a

6

consensual police-citizen encounter that transitioned into an investigative detention supported by reasonable suspicion. *See* 321 S.W.3d 82, 87–88 (Tex. App.—Fort Worth 2010, pet. ref'd). There, the officer received a dispatch that Priddy had just left a hospital and appeared to be intoxicated. *Id.* at 84. The dispatch also provided the officer with Priddy's name, the make of her vehicle, and the direction of her travel. *Id.* The officer located Priddy's vehicle fifteen minutes later in a business area of town, legally parked but still running with its lights on. *Id.* The officer parked behind Priddy's vehicle, turned his spotlight on, and ran the vehicle's license plate. *Id.* When the officer approached Priddy's vehicle, he saw Priddy inside, eating a hamburger. *Id.* When Priddy rolled down the window at the officer's request, the officer smelled the odor of alcoholic beverages and observed that Priddy had glazed and bloodshot eyes. *Id.* We concluded that the officer's initial interaction was not illegal because the officer had not engaged in a show of authority that would lead a reasonable person to believe she was not free to terminate the encounter. *Id.* at 87–88. We further concluded that once Priddy rolled down her window and the officer noticed her glazed and bloodshot eyes and smelled the odor of alcoholic beverages, "the voluntary encounter became an investigative detention based upon reasonable suspicion that [Priddy] had been driving while intoxicated." *Id.* at 88.

Similar to *Priddy*, Officer Bain was justified in approaching Huddleston's vehicle and inspecting the situation. A citizen reported at 2:45 a.m. on July 5, 2008, that a white Ford Ranger had been parked on the side of the road with its

7

lights on for more than an hour. Officer Bain was dispatched to the reported location and observed the described vehicle. Officer Bain did not know whether someone in the vehicle was in distress, but the circumstances warranted further investigation. We conclude, as we did in *Priddy*, that Officer Bain's initial interaction with Huddleston was a consensual police-citizen encounter that did not implicate the Fourth Amendment.[2] *See id.* at 87–88.

Officer Bain could not temporarily detain Huddleston beyond the initial encounter, however, without reasonable suspicion. *See Woodard*, 2011 WL 1261320, at *4. In the early morning hours following the July Fourth holiday, Officer Bain arrived at the scene to see a vehicle parked on the side of a busy roadway, with its lights on, its engine running, and Huddleston sleeping inside with two beer cans within reach. Immediately after waking Huddleston, Officer Bain noticed Huddleston's disorientation, his bloodshot and watery eyes, the odor of alcohol on his breath, and his instability when he exited the vehicle. Based on a totality of the circumstances, Officer Bain had sufficient articulable facts supporting a reasonable suspicion that Huddleston had been engaged in criminal activity. *See Priddy*, 321 S.W.3d at 87–88; *see also Ford*, 158 S.W.3d at

---

[2]Huddleston does not point to any evidence that Officer Bain made a show of authority that would lead a reasonable person to believe he was not free to discontinue the encounter. Indeed, Huddleston does not acknowledge the possibility of a consensual encounter in his brief, despite the trial court's conclusion of law that Officer Bain's initial contact with him was a consensual police-citizen encounter.

492. He was therefore justified in temporarily detaining Huddleston to conduct further investigation.

We hold that Officer Bain's initial approach and contact with Huddleston did not violate the Fourth Amendment because it was a consensual police-citizen encounter and that the initial encounter escalated into an investigative detention supported by reasonable suspicion. *See Priddy*, 321 S.W.3d at 87–88. Accordingly, we overrule Huddleston's first point.

## V. Blood Draw

In his second point, Huddleston asserts that the trial court abused its discretion by denying his motion to suppress because the manner in which his blood draw was conducted was unreasonable. Specifically, Huddleston urges that this case is governed by our prior opinion in *State v. Johnston*, in which we held that the manner in which the blood draw was taken was unreasonable because, among other things, there was no inquiry into Johnston's medical or general health condition. *See* 305 S.W.3d 746, 760 (Tex. App.—Fort Worth 2009), *rev'd*, 336 S.W.3d 649 (Tex. Crim. App. 2011).

Huddleston argues that the present appeal is identical to *Johnston* in all material respects and that because the police officers made no inquiry of his medical history, the blood draw was not medically acceptable. Indeed, Appellant argues that the "only difference" between this case and Johnston "is that the trial court erroneously overruled the motion in this cause and the trial court correctly granted the motion to suppress in *Johnston*." *Johnston*, however, was recently

9

reversed by the court of criminal appeals. *See State v. Johnston*, 336 S.W.3d

649 (Tex. Crim. App. 2011).

In relevant part, the court of criminal appeals held:

> Here, the court of appeals was incorrect to conclude that the officers' failure to inquire into Johnston's medical history and follow up on her condition subjected Johnston to an unjustified risk of medical harm, thereby supporting a ruling that the draw was unreasonable. The [United States] Supreme Court has taken into account the existence of specific medical conditions that may create an unjustified risk, trauma, or pain in ruling that blood-draw tests, when used on the general population, are reasonable. So there is a presumption that venipuncture blood-draw tests are reasonable under the Fourth Amendment, despite recognized medical anomalies and exceptions that may render the administration of such a test unreasonable. Thus, the failure to make an inquiry into an individual's medical history before drawing blood and to conduct a follow up examination does not render blood draws per se unreasonable, as the court of appeals intimated.
>
> Implicit within *Schmerber* is that each suspect bears the burden of showing that a venipuncture blood draw is not a reasonable means to obtain a blood alcohol level assessment as to him or her, individually. And in the absence of any record evidence showing that a venipuncture blood draw would not be reasonable in a particular case due to a verifiable medical condition, we will presume that the choice to administer such a test is reasonable. A DWI suspect, naturally familiar with his or her own medical history, is in the best position to identify and disclose any peculiar medical condition that could result in risk, trauma, or more than de minimus pain if a blood draw were to be performed.

*Id.* at 659–60 (discussing *Schmerber v. California*, 384 U.S. 757, 771, 86

S. Ct. 1826, 1836 (1966)).

Huddleston does not point to any evidence that a venipuncture blood draw

was not a reasonable means to obtain a blood alcohol level assessment as to

him individually. He instead relies exclusively on our previous holding in

*Johnston*.  Because we are bound by the court of criminal appeals's contrary holding in *Johnston,* we overrule Huddleston's second point.

## VI.  Conclusion

Having overruled each of Huddleston's two points, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  GARDNER, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 4, 2011