**Affirmed and Opinion Filed October 30, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00106-CR

### SUZANNE MARIE BATTLES, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the County Criminal Court No. 5**
**Dallas County, Texas**
**Trial Court Cause No. MB1050867F**

## MEMORANDUM OPINION
Before Justices Bridges, Francis, and Myers
Opinion by Justice Francis

A jury convicted Suzanne Marie Battles of driving while intoxicated, and the trial court assessed punishment at 120 days in the county jail, probated for twelve months, and an $800 fine. In her sole issue, appellant complains the trial court denied her motion to suppress the results of a compelled blood draw. We affirm.

Dallas Police Officer Shane Johnson stopped appellant for speeding. Johnson smelled alcohol on appellant's breath and asked her to perform standardized field sobriety tests. Appellant performed poorly, exhibiting multiple "clues" of intoxication on each test, and Johnson asked her to provide a preliminary breath sample at the scene. Appellant refused. Concluding appellant was intoxicated, Johnson arrested her for DWI and had her transported to the jail. There, he asked appellant to consent to a blood draw. Again, appellant refused, and

Johnson obtained a warrant to draw her blood. Mark Poynter, a registered nurse, took appellant's blood while she was in the intoxilyzer room, and subsequent testing showed she had a blood-alcohol content of .13, which is over the legal limit.

Before trial, appellant filed a motion to suppress evidence of the blood test, challenging the legality of the blood draw because it was not done in a sanitary place. The trial court conducted a hearing on the motion after the jury was selected but before trial commenced. At the hearing, the defense called two witnesses in support of the motion: Mark Gibbons, who was the DWI program coordinator at the Dallas Police Department on the night of appellant's arrest, and appellant.

While Gibbons was DWI program coordinator, blood draws were conducted in one of three intoxilyzer rooms at the jail so that they could be videotaped. Gibbons said he told his supervisors the rooms were not a sanitary place to draw blood and suggested the nurse's stations, located next to the intoxilyzer rooms, were a more reasonable location. Ultimately, he was removed as DWI program coordinator after he testified in another criminal case that the intoxilyzer room was not a sanitary place for blood draws. Rather than return to patrol, he retired.

According to Gibbons, the jail smelled like a "men's locker room" and was "nasty." He had seen people spit, bleed, vomit, urinate, and defecate in the intoxilyzer rooms; one person, he said, had died. "For the most part," he said the rooms were not a sanitary place. Weekends were the busiest, and many times on Monday mornings, the trash cans would be overflowing and there would be evidence someone had mopped up urine from the floor. In contrast to the nurse's stations, which were cleaned by the nurses at the start of every shift, Gibbons said the intoxilyzer rooms were cleaned by inmates "at least once a week." He said he had to stand over them to make sure they used fresh, hot, soapy water and a clean mop head. The rooms were never

cleaned after each use and "more often" than not, needed to be cleaned. The procedures produced a clean room, but not a sanitary one. At one point, he said his supervisor sent emails directing that the rooms were "not to be left in those kind of conditions." Since his retirement, he said there is a dedicated room for blood draws and a record is kept to document the cleaning of the room.

On cross-examination, Gibbons acknowledged he had never seen blood drawn in a room with a dead body or in a room with a "puddle of blood" on the floor, with "urine everywhere," or with feces on the floor. He also said he had not seen nurses draw blood at a time when there was blood, urine, or feces on the table where the person's arm rested. He also had never seen a nurse draw blood without first sanitizing the person's arm nor had he seen a blood draw where the arm was placed in "dirty substances."

Appellant testified next and said the condition of the room contributed to her decision to refuse a voluntary blood draw. She said she did not believe the room was sanitary. The room smelled like urine, was unclean, and was not a place where she would eat food. With respect to the blood draw, she said the nurse wiped her arm before taking blood but did not wipe down any area around her. She admitted she did not see any blood stains, urine, or feces in the room.

The State called Poynter, the registered nurse who took appellant's blood. Poynter explained that the only area that needed to be sterile was the area of the body where the blood was drawn. The area where the arm rested, he said, needed only to be "sanitary." Before he did any blood draw, he followed standard procedure by making sure the arm rest area was sanitary by wiping it down with disinfectant. He explained that he used a "special type of cloth" that came from a plastic container; the cloth was disposed of after one use. He left the solution on "long enough to kill the germs or viruses" on the chair or armrest. When taking blood, he first cleaned the person's arm with Betadine, an iodine solution. He used a two-sided needle; one end

–3–

went into appellant's arm and the other end punctured a sealed vacuum container. The blood went from the vein into the tube and was not exposed to the surrounding environment.

On cross-examination, Poynter acknowledged he was not responsible for the cleaning of the intoxilyzer rooms. He said nurses were responsible for minor spills, but inmates cleaned "bigger sanitary" issues. Poynter had no recollection of this specific blood draw, other than from the records, and did not know when the last time the room had been cleaned before appellant's blood was drawn. However, his procedure was to make sure the chair and the patient were in a "condition" to have blood drawn.

Poynter agreed that a hospital or doctor's office would be a "more ideal" location for drawing blood than a jail. When asked if there was a "big difference" between a hospital and jail "as far as standards," Poynter said the intoxilyzer room was "much cleaner" than the emergency room at Parkland Hospital "in a lot of ways." He explained the intoxilyzer room is smaller and "easier to control," while the emergency room at Parkland or any hospital is "just not conducive to the level of control" one has in a smaller room. He said jails and hospitals are similar in that both have many people coming in and out and the environment is exposed to bodily liquids. Poynter also said jail authorities have changed the room where blood draws are performed but not the procedures.

After hearing the evidence, the trial court denied appellant's motion to suppress. At trial, Poynter gave testimony similar to that given at the suppression hearing. Although he did not specifically recall taking appellant's blood, Poynter testified he would not do a blood draw in an environment that was not clean and sanitary. Officer Johnson, who did not testify at the suppression hearing, testified he was present when appellant's blood was drawn. Although a video of the blood draw did not show the nurse wiping down the station where the blood draw occurred, Johnson testified he did every blood draw "the same" and made sure the nurses cleaned

the area. Further, he said he did not see any blood stains, urine, or feces in the room when appellant's blood was taken. State's exhibit 3, which was a DVD of the blood draw, was admitted into evidence. Although the video depicts scuff marks on the floor, there are no obvious foreign substances on the floor, walls, chairs, or desktop.

Appellant's only witness at trial was Gibbons, who reiterated the testimony he gave at the suppression hearing regarding the intoxilyzer rooms and his belief they were not sanitary places to draw blood. He did acknowledge, however, that the procedure for a blood draw included the nurse wiping the general area, like the table or chair, with a solution.

On appeal, appellant contends the trial court erred by denying her motion to suppress evidence of the results of the compelled blood test. She argues the evidence showed that the room where her blood was taken, the intoxilyzer room, was not sanitary and therefore the manner and procedure in taking her blood was unreasonable.

Generally, in determining whether a trial court's decision on a motion to suppress is supported by the record, we consider only the evidence adduced at the suppression hearing because the court's ruling was based on it rather than evidence presented later at trial. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). This general rule, however, does not apply when the suppression issue has been consensually relitigated at trial, as in this case.[1] *Id*.

When reviewing a trial judge's ruling on a motion to suppress, we view all of the evidence in the light most favorable to the trial judge's ruling. *State v. Johnston*, 336 S.W.3d 649, 657 (Tex. Crim. App. 2011). When the trial court fails to make explicit findings of fact, we imply fact findings that support the trial court's ruling so long as the evidence supports these

---

[1] Appellant suggests our review is limited to the evidence presented at the suppression hearing. We disagree. The record shows the State's witnesses were questioned by both sides on issues related to the condition of the intoxilyzer room and whether cleaning procedures were different. The only defense witness called was Gibbons, who testified almost exclusively about the condition of the intoxilyzer room and his opinion that the room was not a sanitary place to perform blood draws. Finally, the issue was given to the jury. The charge instructed the jury that the "blood specimen must be taken in a sanitary place." Further, the charge instructed that before the jury considered the results of the blood test, it had to believe beyond a reasonable doubt "that it accurately measured the amount of alcohol in the defendant's blood as previously defined."

implied findings. *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). We afford almost total deference to a trial judge's determination of historical facts when they are supported by the record. *Johnston*, 336 S.W.3d at 657. The prevailing party is entitled to "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Id.* (quoting *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). We also afford almost total deference to the trial judge's rulings on mixed questions or law and fact when the resolution of those questions depends upon an evaluation of credibility and demeanor. *Id*. We review de novo mixed questions of law and fact that do not depend on an evaluation of credibility and demeanor. *Id*. We also review de novo all purely questions of law. *Id.*

A compelled blood draw is a search and seizure under the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 767 (1966); *Pacheco v. State*, 347 S.W.3d 849, 853 (Tex. App.—Fort Worth 2011, no pet.). The United States Supreme Court has set out a two-part analysis for determining the reasonableness of a blood draw. *Schmerber*, 384 U.S. at 768. This analysis requires a court to examine:

> 1. whether the police were justified in requiring the defendant to submit a blood test; and
>
> 2. whether the means and procedures employed in taking the defendant's blood respected relevant Fourth Amendment standards of reasonableness.

*Id.*; *Johnston*, 336 S.W.3d at 658.

The second part of the analysis contains two discrete questions. First, when resolving the reasonableness of the "means" employed, it must be determined whether the test chosen was reasonable. *Schmerber*, 384 U.S. at 768; *Johnston*, 336 S.W.3d at 658. Second, when resolving the reasonableness of the procedure employed, it must be determined whether the test was performed in a reasonable manner. *Schmerber*, 384 U.S. at 771–72; *Johnston*, 336 S.W.3d at

658. We review the reasonableness of the manner in which a DWI suspect's blood is drawn on an objective, case-by-case basis in light of the totality of the circumstances surrounding the draw. *Johnston*, 336 S.W.3d at 661.

Appellant does not challenge the first part of the analysis nor does he bring any complaint under the second part of the analysis regarding the reasonableness of the test chosen. Rather, appellant complains solely about the environment in which her blood was taken.

In *Johnston*, the court of criminal appeals concluded that *Schmerber's* reasonable manner requirement does not act as a "per se bar" to blood draws conducted in a non-medical environment. 336 S.W.3d at 662. Rather, while a medical environment may be "ideal," reasonableness depends upon whether the environment is a safe place in which to draw blood. *Id*. The court concluded that a blood-draw room at the Dalworthington Gardens police station was safe and therefore reasonable under the Fourth Amendment. The court explained the room was in accordance with accepted medical practices and did not "invite an unjustified element of personal risk of infection or pain." *Id*. at 662–63. In arriving at its conclusion, the *Johnston* court noted the evidence included a description of the room as "clean, but not sterile," with furniture that "could be cleaned with a commercial sanitizer before each use." *Id*. at 652.

Appellant contends Gibbons's testimony established that the intoxilyzer rooms were "unclean and unsanitary" during the time appellant's blood was drawn. He asserts that, unlike other cases addressing this issue, no witness testified the room was "maintained in a manner that followed medically accepted procedures," the room was "clean" or "relatively sanitary" at the time of the draw, it was cleaned two or three times a day, or a disinfectant was used to clean the room before blood was drawn. *See Johnston*, 336 S.W.3d at 658; *Gambini*, No. 01-12-00395-CR, 2013 WL 4680380, at *5 (Tex. App.—Houston [1st Dist.] Aug. 29, 2013, pet. ref'd) (mem. op., not designation for publication); *Martin v. State*, No. 10-10-00426-CR, 2012 WL 3242666,

at *3 (Tex. App.—Waco Aug. 9, 2012, pet. ref'd) (mem. op., not designation for publication); *Adkins v. State*, 418 S.W.3d 856, 861 (Tex. App.—Houston [14th Dist.] 2013, pet. dism'd, untimely filed); *Glaser v. State*, No. 05-11-00119-CR, 2012 WL 1034923, at *3 (Tex. App.—Dallas Mar. 29, 2012, no pet.) (not designated for publication); *Stone v. State*, No. 05-12-01521-CR, 2013 WL 6405485, at * 2 (Tex. App.—Dallas Dec. 5, 2013, no pet.) (mem. op., not designated for publication).

Although Gibbons testified generally that he did not believe the intoxilyzer rooms were sanitary, his opinion was based, at least in part, on the fact he had seen people spit, bleed, vomit, urinate, and defecate in the rooms on prior occasions and that inmates, instead of nurses, cleaned the room, requiring him to "stand over" the inmates to ensure they used hot soapy water and a clean mop head when cleaning the floors. But there was no evidence that any of those substances were in the intoxilyzer room when appellant's blood was drawn. In fact, the DVD depicting the room showed a tidy room with some scuff marks on the floor but did not reveal any obvious foreign substances on the floor, wall, chairs, or desktop.

Poynter testified the only area that needed to be "sterile" was the area where the blood was taken; the area where the arm rested needed to be "sanitary." And while Poynter did not specifically remember drawing appellant's blood, he said he would not do a blood draw in an area that was not clean and sanitary. Poynter stated his standard practice was to ensure the patient, the patient's arm, and the chair were in a "condition" to have blood drawn. He explained that he wiped down the area where the arm rested with a special cloth that was used only once. He left the solution on the area long enough to kill any germs or viruses. When taking blood, he cleaned the person's arm with iodine. The blood was then drawn into a vacuum-sealed tube and was not exposed to the environment. Nothing on the video indicated appellant suffered any pain as a result of the procedure. Finally, Officer Johnson was present when appellant's blood was

drawn and said he always made sure the nurse cleaned the chair area before taking a person's blood.

Considering the totality of the circumstances and affording the State the "strongest legitimate view" of the evidence and all reasonable inferences that can be drawn from it, we conclude the environment here was safe and did not "invite an unjustified element of personal risk of infection or pain." We therefore reject appellant's argument that the manner in which her blood was drawn was unreasonable and further conclude the trial court did not err in denying appellant's motion to suppress. We overrule appellant's sole issue.

We affirm the trial court's judgment.

Do Not Publish
TEX. R. APP. P. 47                                    /Molly Francis/
130106F.U05                                         MOLLY FRANCIS
                                                    JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SUZANNE MARIE BATTLES, Appellant

No. 05-13-00106-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Criminal Court
No. 5, Dallas County, Texas
Trial Court Cause No. MB1050867F.
Opinion delivered by Justice Francis;
Justices Bridges and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered October 30, 2014.