# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00536-CR

### The State of Texas, Appellant

### v.

### Wayne Denton Dickerson, Appellee

#### FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
#### NO. CR2008-397, THE HONORABLE RONALD G. CARR, JUDGE PRESIDING

#### M E M O R A N D U M   O P I N I O N

Appellee Wayne Dickerson was charged with two counts of aggravated sexual assault of a child. *See* Tex. Penal Code Ann. § 22.021 (West Supp. 2011). Prior to trial, Dickerson filed a motion to suppress the oral and written statements he made to a detective during the investigation. After conducting a hearing on the motion, the trial court suppressed the statements on the ground that Dickerson was in custody at the time the statements were made and the detective failed to provide his *Miranda* or Article 38.23 warnings. *See Miranda v. Arizona*, 384 U.S. 436 (1966); Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a) (West 2005). On appeal, the State contends that the trial court abused its discretion in granting the motion to suppress. We reverse the trial court's order suppressing the statements and remand for further proceedings.

**BACKGROUND**

The testimony and evidence presented at the suppression hearing reflect that Comal County Deputy Mike Smith was dispatched to the Cowboys for Jesus Church on May 13, 2008, for a report of possible child abuse.[1] Michael Reed reported that one of his students, A.W., told him that her stepfather was abusing her seven-year-old sister. Reed told the deputy that he contacted A.W.'s grandmother, Deena Lindell,[2] who told him that her daughter, Jennifer Dickerson, had told her that Dickerson had performed oral sex on their daughter, C.D., a long time ago. After talking to Reed, Deputy Smith contacted Lindell, who reported the same information to him—that approximately one month ago her daughter had called her crying and told her that she remembered waking up one night when C.D. was sleeping with her and Dickerson and she saw Dickerson performing oral sex on C.D.

The deputy then spoke with A.W., who disclosed physical abuse by Dickerson and expressed concerns that Dickerson was physically and sexually abusing her sister, C.D. According to A.W., several months ago she saw a bruise on C.D.'s leg and, when she asked her about it, C.D. told her that Dickerson had pinched her. A.W. told Deputy Smith that she saw C.D. the previous Saturday and asked her if Dickerson had touched her anywhere that was bad, whereupon C.D. told her that she and her dad "had secrets." A.W. told the deputy that C.D. has been living with her father

_____

[1] The facts regarding the initial report of abuse are taken from the offense reports admitted as defense exhibits during the suppression hearing. The remaining facts are obtained from the testimony at the suppression hearing and the statements themselves.

[2] The record reflects that A.W. was living with Lindell, her grandmother.

2

since her mother and Dickerson were going through the divorce. She told Deputy Smith that she was afraid Dickerson was hurting her sister.

After obtaining written statements from Reed, A.W., and Lindell, Deputy Smith contacted Detective Jason Nitsch, the on-call detective. Deputy Smith then contacted Jennifer Dickerson, A.W. and C.D.'s mother, who related the incident of waking up and seeing Dickerson performing oral sex on C.D. She indicated that she could not remember the date of the incident but believed C.D. was two or three years old.

Deputy Smith then contacted CPS to advise the department of the situation and was advised that CPS wanted C.D. removed from Dickerson's home pending a CPS investigation and asked the deputy to find a family member with whom C.D. could be placed. After Detective Nitsch arrived, the officers met at a nearby restaurant parking lot to determine how to proceed. As it was time for a shift change, Deputy Smith and his partner were dismissed. Nitsch, his sergeant, and two midnight-shift deputies proceeded to Dickerson's residence to make contact with Dickerson and remove C.D. from the residence pending investigation in accordance with a CPS "safety plan."

At the hearing on the motion to suppress, Nitsch testified that he made contact with Dickerson at his residence at approximately midnight on May 13, 2008. Nitsch indicated that his sergeant advised Dickerson that they were there concerning allegations regarding his daughter, C.D., and requested that, pursuant to the CPS "safety plan," C.D. be temporarily placed with a family member. Nitsch testified that Dickerson agreed to a voluntary removal placing C.D. with his mother. Dickerson contacted his mother, who arrived shortly thereafter with her husband and signed the safety plan indicating she would care for C.D. until notified by CPS or law enforcement. According

3

to the detective's testimony, once C.D. left with Dickerson's mother, Dickerson agreed to follow Nitsch to the Comal County Sheriff's Office so the detective could interview him and obtain a voluntary statement.

Nitsch testified that Dickerson drove his own truck, following him 20-25 miles to the sheriff's office. He took Dickerson to his office, set up the video camera, and told Dickerson he was going to record the interview. Nitsch sat behind his desk while Dickerson sat next to the open door.[3] He testified that he did not give Dickerson the *Miranda* warnings or the Article 38.22 warnings prior to the interview or the taking of the written statement because, in his view, Dickerson was not in custody.[4] The detective also testified that he knew he was not going to take Dickerson into custody because this was something that had happened several years ago and he knew that the child had been removed from the house with the safety plan intact, so the threat was gone. At that point, Nitsch explained, he was simply conducting an investigation. The video of the interview reflects that Nitsch immediately informed Dickerson he was not under arrest and was free to leave at any time. After initial statements related to identification and establishing the date and time, the interview proceeded as follows:

---

[3] The detective explained that the two of them were the only people in the building, so noise was not a factor.

[4] *Miranda* warnings include a statement informing the individual of the right to remain silent, that any statement made may be used as evidence against him, that he has the right to have an attorney present during questioning, and if he is unable to hire an attorney, he has the right to have an attorney appointed if he cannot afford one. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These warnings are also required by Article 38.22 of the Texas Code of Criminal Procedure, except that the statute includes an additional warning that the accused "has the right to terminate the interview at any time[.]" Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a) (West 2005).

4

| | |
|---|---|
| Detective Nitsch: | And how did you get here? |
| Dickerson: | I drove my personal truck. |
| Detective Nitsch: | And you understand that you are here of your own free will? |
| Dickerson: | Yes. |
| Detective Nitsch: | And you are going to leave the same way you came in. |
| Dickerson: | Yeah. |
| Detective Nitsch: | You can go out the same door you came in and the bathrooms are on the left when you came in? |
| Dickerson: | Right. |
| Detective Nitsch: | Let me set something up. We talked before at your house and you kind of know everything that is going on so we would like to just kind of clarify some things so we can hurry up and get this issue resolved. |
| Dickerson: | Yeah, you ain't kidding. |
| Detective Nitsch: | You understand that you are not under arrest? |
| Dickerson: | Right. |
| Detective Nitsch: | And you are free to leave any time. If for some reason during the interview you decide that you don't want to talk any more all you have to do is tell me, you know, and you can get up and leave. You are not required. |
| Dickerson: | Yeah, I have nothing to hide, I haven't done anything. |

At first, Dickerson denied any abuse of C.D., explaining that the abuse allegations were a "set up" by Jennifer's family. However, as the interview progressed, when Nitsch provided details of the allegation of oral sex, Dickerson "clicked" on what the allegations were. He indicated

5

that the incident did happen a long time ago. He explained to the detective that he was asleep, did not know his daughter was in bed with them, and thought he was performing oral sex on his wife until his wife hit him, "waking" him up. The interview lasted approximately 50 minutes. At the conclusion of the interview, Nitsch discussed Dickerson's providing a written statement, explaining to Dickerson that it was his opportunity to put down on paper "what happened, why it happened, and how it happened." Dickerson then requested a restroom break. He went—unescorted—to the restroom and then went to smoke outside. The smoke break lasted 20-30 minutes, during which time Dickerson was alone outside and made several calls on his cell phone to Jennifer Dickerson. After the smoke break, Nitsch sat with Dickerson at a table in the break room while he provided a written statement.[5] After completing the written statement, Nitsch and Dickerson returned to the detective's office to conclude the video recording. Dickerson then left the sheriff's office in his own truck. Nitche testified that after interviewing Dickerson, he continued his investigation. He never arrested Dickerson, nor did he obtain an arrest warrant. Instead, after completing his investigation he submitted the case to the district attorney's office for review.

On cross-examination, Nitsch testified that he advised Dickerson numerous times that he was free to leave, but conceded that he did not ask Dickerson if he "felt" that he was free to leave. He testified that when Dickerson was outside smoking, he checked on him several times, through a window, to make sure he was still there because "[i]f he got in his truck and drove off, I wasn't going to sit around there all night. I would have gone home." In response to defense counsel's

---

[5] A video recording of the break room was offered into evidence at the hearing. However, the video recording does not have any audio and merely depicts the detective and Dickerson sitting at the table in the break room as Dickerson writes out his statement.

questions, he stated that if Dickerson had left, he would not have gone after him and would not have charged him with escape. The detective agreed that he had probable cause to arrest Dickerson after he admitted that he had performed oral sex on C.D.

Dickerson also testified at the suppression hearing. He testified that Detective Nitsch's testimony was true "to a certain extent." He stated that when the deputies came to his house, he felt "very uncomfortable" and thought he was going to jail. He indicated that the deputies *told* him to follow them to the sheriff's office—rather than *asking* if he would—and he felt like he had to go.[6] He stated that he executed the written statement because he was told to and did not think he had a choice. He testified that originally at his home, when the officers discussed C.D. going with Lindell, he objected and told them he did not want his daughter to go with his mother-in-law. Instead, he wanted his daughter to go with his mother. Dickerson confirmed that the officers accommodated him and allowed him to call his mother to come get C.D.

In his testimony, Dickerson stated that he drove down to the Comal County Sheriff's Office in his own truck. He acknowledged that he was never placed in a patrol car or placed in handcuffs or any type of restraint. He agreed that the detective informed him at the beginning of the interview that he was not under arrest and was free to leave at any time. He also agreed that on the video he expressed his understanding of those facts. However, he testified that he was being sarcastic when he said "yeah" after being told he was free to leave at any time. He testified that during the videotaped interview, he felt like he had to be there. He stated that on arrival at the CID

---

[6] We note, however, that in his brief, in the section relating "pertinent facts," Dickerson recites that "[t]he detectives inquired of [him] if he would be willing to come in [sic] the Sheriff's office to provide a statement."

7

building, everything was locked—that the detective had to unlock the gate to allow them to pass through as well as unlock the door to the building. He testified that he thought he was in custody because "they took my daughter and were taking me out of my house, too." On re-direct, Dickerson also testified that he was in special education classes throughout his schooling and had to be put in private schools to avoid the danger of being held back.

On cross-examination, Dickerson confirmed that he had his cell phone with him throughout the interview process. He testified that he made several phone calls while he was driving to the sheriff's office as well as while he was outside during his smoke break. He stated that he thought he might be arrested after his statement to Detective Nitsch, but confirmed that he was told from the beginning that he could leave whenever he wanted, and did in fact leave in his own vehicle after writing out his statement after the interview.

No other witnesses testified at the hearing. After argument from both parties, the trial court summarily granted Dickerson's motion. In subsequent findings of fact and conclusions of law, the court found that Dickerson was the subject of a custodial interrogation and concluded that the failure to comply with *Miranda* and Article 38.22 rendered the statements inadmissible.

The State appeals the suppression of Dickerson's oral and written statements, challenging the trial court's findings and conclusions.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). We review the record to determine whether the trial court's ruling is supported by the record and is correct under some theory

8

of law applicable to the case. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). A trial court abuses its discretion when its ruling is arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005).

In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review. *Wilson v. State*, 311 S.W.3d 452, 457-58 (Tex. Crim. App. 2010); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). Although we give almost total deference to the trial court's determination of historical facts, we conduct a de novo review of the trial court's application of the law to those facts. *Wilson*, 311 S.W.3d at 458; *Carmouche*, 10 S.W.3d at 327. When a trial court makes explicit fact findings, as it did here, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports these fact findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006); *Figueroa v. State*, 250 S.W.3d 490, 508 (Tex. App.—Austin 2008, pet. ref'd).

The trial judge is the sole trier of fact and exclusive judge of credibility of the witnesses and the weight to be given to their testimony. *St. George*, 237 S.W.3d at 725; *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Unless the trial court abuses its discretion by making a finding unsupported by the record, we defer to the trial court's findings of fact and will not disturb them on appeal. *Miller v. State*, 335 S.W.3d 847, 854 (Tex. App.—Austin 2011, no pet.); *see State v. Johnson*, 336 S.W.3d 649, 657 (Tex. Crim. App. 2011); *Guzman*, 955 S.W.2d at 89. We also afford almost total deference to the trial judge's rulings on mixed questions of law and fact when the resolution of those questions depends on an evaluation of credibility and demeanor. *Johnson*, 336 S.W.3d at 657; *Guzman*, 955 S.W.2d at 89. We review de novo mixed questions of

law and fact that do not depend on an evaluation of credibility and demeanor. *Johnson*, 336 S.W.3d at 657; *Guzman*, 955 S.W.2d at 89. All purely legal questions are reviewed de novo. *Johnson*, 336 S.W.3d at 657; *Kothe v. State*, 152 S.W.3d 54, 62-63 (Tex. Crim. App. 2004).

## DISCUSSION

In its fourth point of error, the State argues that the trial court abused its discretion by finding that Dickerson was subjected to custodial interrogation based on Dickerson's subjective beliefs. We agree that the record does not support the trial court's determination that Dickerson's oral and written statements were the product of custodial interrogation.

### *Custodial Interrogation*

Detective Nitsch did not read Dickerson his statutory or *Miranda* rights. Thus, the admissibility of his oral and written statements depends on whether he was in custody when he gave them.[7] Custodial interrogation occurs when law enforcement officers initiate the questioning of a person who has been taken into custody or otherwise deprived of freedom of action in any significant way. *Miranda*, 384 U.S. at 444; *see Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). A person is "in custody" if, under the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). The record as a whole must "clearly establish" that the statement was the product of custodial interrogation. *Herrera*, 241 S.W.3d at 526 (citing

---

[7] Neither *Miranda* nor Article 38.22 prohibits the admission of a statement that is not the product of a custodial interrogation. *Miranda*, 384 U.S. at 444; Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2, 5 (West 2005).

*Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005)). The defendant bears the initial burden of proving that a statement was the product of a custodial interrogation. *Herrera*, 241 S.W.3d at 526; *see Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009).

In determining whether an individual is in custody, we first examine all of the circumstances surrounding the interrogation to determine if there was a formal arrest or "restraint of freedom of movement to the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994). This determination focuses on the objective circumstances of the interrogation and not on the subjective views of either the interrogating officers or the person being questioned. *Id.* at 323. We next consider whether, in light of the particular circumstances, a reasonable person would have felt that he was at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Herrera*, 241 S.W.3d at 532. The court of criminal appeals has outlined four general situations that may constitute custody:

> (1) when the suspect is physically deprived of his freedom of action in any significant way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest [and the officers' knowledge of probable cause is communicated to the suspect] and law enforcement officers do not tell the suspect that he is free to leave.

*Dowthitt*, 931 S.W.2d at 255. These situations will indicate custody if the circumstances would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.*; *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983). Concerning the first three situations, the restriction on freedom of movement must amount to the degree associated with an arrest as

opposed to an investigative detention. *Dowthitt*, 931 S.W.2d at 255. Concerning the fourth situation, the officer's knowledge of probable cause must be manifested to the suspect and does not, by itself, establish custody. *Id.*

A trial court's ultimate custody determination presents a mixed question of law and fact. *Herrera*, 241 S.W.3d at 526. Therefore, we afford almost total deference to a trial judge's custody determination when the questions of historical fact turn on credibility and demeanor. *Id.* at 526-27 (citing *Ripkowski v. State*, 61 S.W.3d 378, 381 (Tex. Crim. App. 2001)). Conversely, when the questions of historical fact do not turn on credibility and demeanor, we review a trial judge's custody determination de novo. *Id.* at 527. We examine all of the circumstances surrounding the interrogation to determine whether a reasonable person in the defendant's position would have felt he was not at liberty to end the interrogation and leave. *Herrera*, 241 S.W.3d at 532. Such circumstances include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012) (internal citations omitted). The ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest. *Estrada v. State*, 313 S.W.3d 274, 294 (Tex. Crim. App. 2010); *see Stansbury*, 511 U.S. at 322; *Dowthitt*, 931 S.W.2d at 254.

### *Analysis*

The trial court ultimately concluded that, "[a] careful review of all the pertinent circumstances in the instant case dictates that the Appellee's [sic] statement resulted from

custodial interrogation. The failure to comply with *Miranda*, and Article 38.22 rendered the statement[s] inadmissible." The trial court found that Dickerson was the subject of custodial interrogation because:

> 1) Dickerson was the focus of the investigation; 2) the subjective intent of the police, as stated by Nitsch in his testimony regarding the restaurant parking lot meeting, was to obtain statements from Dickerson without complying with article 15.17 or 38.22 or Miranda and its progeny; 3) prior to questioning Dickerson and obtaining statements from him the police had probable cause to arrest Dickerson; and 4) the subjective intent of Dickerson, as stated in his sworn testimony during the suppression hearing, in answering police questions and giving his statements was governed by his belief that he had no choice other than to submit to questioning and give his statements and he was unaware of his rights under article 15.17, article 38.22 and Miranda.

In its custody determination, however, the trial court failed to focus on the relevant inquiry.

First, being the "focus" of an investigation does not necessarily render a person "in custody" for purposes of receiving *Miranda* warnings or those required under Article 38.22 of the Code of Criminal Procedure. *Gardner*, 306 S.W.3d 274, 293; *see Beckwith v. United States*, 425 U.S. 341, 347 (1976); *Meek v. State*, 790 S.W.2d 618, 621 (Tex. Crim. App. 1990). The appropriate inquiry is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Gardner*, 306 S.W.3d 274, 293-94; *see Herrera*, 241 S.W.3d at 525 ("custodial interrogation" is questioning initiated by police officers after person has been taken into custody or otherwise deprived of freedom in any significant way).

Second, the custody determination is based entirely on objective circumstances. *Stansbury*, 511 U.S. at 323. The subjective intent of the police is irrelevant except to the extent that

it is manifested in the words or actions of law enforcement officials. *Dowthitt*, 931 S.W.2d at 254 (citing *Stansbury*, 511 U.S. at 323). Thus, an

> officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

*Estrada*, 313 S.W.3d at 294; *see Stansbury*, 511 U.S. at 325. Such was not the case here. Moreover, the trial court's finding concerning subjective intent of police in this case is not supported by the record. Nothing in Detective Nitsch's testimony—even had the court found the detective not to be credible—or the offense reports admitted at the hearing supports a finding that the subjective intent of law enforcement was to subject Dickerson to custodial interrogation but intentionally not provide him with the statutory or *Miranda* warnings.

Third, the officer's knowledge of probable cause must be manifested to the suspect and does not, by itself, establish custody. *Dowthitt*, 931 S.W.2d at 255. Rather, a suspect is in custody if "the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Id.* Here, Detective Nitsch expressed in his testimony that he did not necessarily believe he had probable cause to arrest Dickerson prior to his admission in the interview. Further, while he conceded that he did have probable cause to arrest after Dickerson admitted to performing oral sex on C.D., he never manifested that belief to Dickerson. In fact, after Dickerson's admission, Nitsch allowed him to go to the restroom unaccompanied and to go outside unescorted to smoke. Even after he

14

had probable cause to arrest Dickerson, the detective never arrested him or even obtained an arrest warrant.

Finally, much of the trial court's findings focus on what Dickerson believed or felt that night: "he felt he had no choice," "D did not believe Nitsch," "D did not believe he was free to leave," "D did not believe he had any choice," "D believed his freedom was restrained and that he was, in fact, in custody to the extent D believed he would be arrested as soon as he finished his statements," "D believed he would be arrested at the conclusion of his statements because his daughter had been removed from his custody without his consent,"[8] and the actions of law enforcement "creat[ed] in the mind of a special education student the idea he had no choice other than to accompany them." However, Dickerson's subjective feelings or beliefs, or the feelings or beliefs of a "special education student" as he purported to be, are not relevant to the custody determination. This determination focuses on the objective circumstances of the interrogation, not on the subjective views of either the interrogating officers or the person being questioned. *Stansbury*, 511 U.S. at 323. The relevant inquiry is whether the circumstances would lead a reasonable person to believe that he is under restraint to the degree associated with formal arrest—not what Dickerson believed or what a special education student would believe. Under the

---

[8] The record does not support a finding that the child was removed from Dickerson's custody without his consent. The testimony of both Detective Nitsch and Dickerson reflects that law enforcement, at the request of CPS, found a family member with whom to place C.D. during the pending investigation. When Dickerson objected to placement with his mother-in-law, the deputies accommodated his request to allow his mother to pick up C.D. Given the allegations of child abuse, a reasonable person would expect CPS and law enforcement to ensure the child's safety, away from the alleged perpetrator, pending investigation.

circumstances here, a reasonable person would not have believed that he was under restraint to the degree associated with an arrest.

Dickerson testified that the deputies told him to come to the sheriff's office. Apparently relying on that testimony, the trial court found that Dickerson had been "ordered" by the deputies to come to the station to give a statement. Dickerson's testimony arguably supports the trial court's finding. However, while this fact may be a circumstance suggesting custody, the totality of all the undisputed evidence surrounding Dickerson's interview does not demonstrate the degree of restraint of freedom associated with a formal arrest. The remaining circumstances do not support—indeed, they affirmatively negate—a finding that a reasonable person in Dickerson's position would have felt he was not at liberty to end the interview and leave.

Dickerson followed Detective Nitsch to the sheriff's office driving in his own truck. On the way he made several phone calls on his cell phone. Once at the sheriff's office, the questioning took place in the detective's office, with the door open.[9] Dickerson acknowledged at the beginning of the interview that he was there of his own free will. The detective informed Dickerson that he was not under arrest, was free to leave at any time, could terminate the interview, and was not required to talk to him. *See Fields*, 132 S.Ct. at 1193 (singling out communicated non-custodial status as most important factor in determining that inmate taken from his cell to prison

---

[9] We do not find the fact that Detective Nitsch had to unlock the gate or the door to a secured building at 2:00 a.m. in the morning to be indicative of custody. The record reflected that Dickerson and the detective were the only people in the building at that time. A reasonable person would not expect the Comal County Sheriff's offices to be unlocked and unsecured in the middle of the night when no one was present in the building.

16

conference room for questioning about events that occurred outside prison was not "in custody" for *Miranda*). Dickerson acknowledged each of these statements with a verbal response.

The interview was relatively short, just under one hour. Statements made to and questions asked of Dickerson ranged from friendly to somewhat accusatory. The detective made no gestures or comments that appeared to be threatening. Dickerson was not handcuffed or physically restrained. He sat right next to the open office door while the detective sat behind his desk. Dickerson would not have had to walk past the detective to leave. At his request, Dickerson was allowed to go the restroom at the end of the interview, before providing a written statement. He went to the bathroom unescorted and then went outside to smoke—alone—for 20 to 30 minutes. He had his cell phone with him, and made multiple phone calls during his smoke break. Finally, after the interview and after providing a written statement, Dickerson left the sheriff's office in his truck.

Reviewing all the circumstances surrounding Dickerson's interview, based on undisputed evidence, we conclude that the record does not support the trial court's determination that Dickerson was in custody when he provided his oral and written statements. Consequently, we hold that the trial court erred in concluding that the failure to provide the statutory or *Miranda* warnings rendered Dickerson's oral and written statements inadmissible. Dickerson was not in custody. Therefore, neither *Miranda* nor Article 38.22 prohibits the admission of his oral or written statements. *See Miranda*, 384 U.S. at 444; Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2, 5 (West

2005). Accordingly, the trial court abused its discretion in suppressing the statements. We sustain the State's fourth point of error.[10]

**CONCLUSION**

We reverse the order of the trial court granting Dickerson's motion to suppress, order that the motion be denied, and remand the cause to the trial court for further proceedings consistent with this opinion.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Reversed and Remanded

Filed: July 27, 2012

Do Not Publish

---

[10] Because we sustain the State's fourth point of error and remand this cause for further proceedings, we need not and do not address the State's remaining three points of error.