

# IN THE
# TENTH COURT OF APPEALS

### No. 10-10-00426-CR

DANNY PAUL MARTIN,

Appellant

v.

THE STATE OF TEXAS,

Appellee

**From the 18th District Court
Johnson County, Texas
Trial Court No. F43641**

## MEMORANDUM  OPINION

In two issues, appellant Danny Paul Martin challenges his conviction for felony DWI.  Specifically, he argues that:  (1) the blood specimen taken was done in an unreasonable manner in violation of the Fourth Amendment; and (2) his sixty-year sentence was excessive and disproportionate.  We will affirm.

On the evening of February 25, 2009, Martin met his girlfriend, Shannon Clanahan, at Chance's, a bar in Johnson County.  That night, Martin drank several beers (Martin testified and admitted that he drank at Chance's that night) before the bar

closed at midnight. Martin and Clanahan left the bar at midnight to go eat at the Huddle House in Cleburne. After eating, Martin and Clanahan got into Martin's work truck and backed out of the parking space. While backing out, Martin collided with the front end of a vehicle owned by Lorie Lewallen, a Huddle House employee. Martin asked Lewallen not to call the police, handed her his business card, and promised that his company's insurance would cover the damages. Lewallen agreed to not call the police, and Martin and Clanahan drove off.

With pieces of Lewallen's vehicle in his bumper, Martin left the Huddle House parking lot. Shortly thereafter, DPS Trooper Jim Gilliam pulled behind Martin's truck. Trooper Gilliam noticed that one of Martin's tail lights was broken and that there were broken car parts in the truck's bumper. Based on these observations, Trooper Gilliam pulled Martin over. When speaking to Martin, Trooper Gilliam observed a strong odor of alcohol emanating from the truck and noticed that Martin's eyes were red and glassy. Suspecting that Martin was intoxicated, Trooper Gilliam instructed Martin to get out and walk to the back of the truck. In doing so, Martin was unsteady on his feet. Martin admitted that he had recently hit Lewallen's vehicle in the Huddle House parking lot and that he had consumed several alcoholic beverages that night. Trooper Gilliam then administered several field sobriety tests, all of which Martin performed poorly.

Martin was arrested and taken to the intoxilyzer room at the Johnson County Law Enforcement Center. There, Trooper Gilliam provided DIC-24 warnings to Martin and requested blood and breath samples. Martin refused both requests. Trooper Gilliam obtained a search warrant for Martin's blood. James Early, a licensed

vocational nurse working for the Johnson County Sheriff's Department, took a blood sample from Martin while he was still in the intoxilyzer room. The blood sample was then delivered to the DPS lab in Waco for testing. The test revealed that Martin had a blood-alcohol concentration level of 0.11, which exceeds the legal limit of 0.08.

Martin was indicted for "Driving While Intoxicated-Third or More," with the indictment containing several enhancement paragraphs, including two felony DWI convictions. Martin pleaded "not guilty" to the charged offense, but he stipulated to the two felony DWI convictions. At the conclusion of trial, the jury found Martin guilty of the charged offense, found the two felony enhancement paragraphs to be "true," and assessed punishment at sixty-years' imprisonment.

In his first issue, Martin contends that the blood draw was conducted in an unreasonable manner as to violate the Fourth Amendment.[1] In particular, Martin complains that the manner in which the blood draw was conducted was unreasonable because the intoxilyzer room—where the blood sample was taken—was unsanitary.

We review the admission of evidence under an abuse-of-discretion standard. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). A trial court abuses its discretion if its ruling is outside the zone of reasonable disagreement. *Id.*

---

[1] At trial, Martin objected to the admission of the results of the blood draw, arguing that "there is no evidence that the blood specimen was taken in a sanitary place pursuant to [section] 724.017 of the Transportation Code." *See* TEX. TRANSP. CODE ANN. § 724.017(a) (West 2011) ("Only a physician, qualified technician, chemist, registered professional nurse, or licensed vocational nurse may take a blood specimen at the request or order of a peace officer under this chapter. The blood specimen must be taken in a sanitary place."). *But see Johnston v. State*, 336 S.W.3d 649, 661 (Tex. Crim. App. 2011) (stating that Chapter 724 "is not controlling authority when it comes to determining the reasonableness of how a blood draw was performed under the Fourth Amendment); *Beeman v. State*, 86 S.W.3d 613, 616 (Tex. Crim. App. 2002) (holding that Chapter 724 is inapplicable when there is a warrant to draw blood and that compliance with Chapter 724 is not necessary to satisfy the Fourth Amendment).

The United States Supreme Court, in *Schmerber v. California*, addressed the constitutionality of compulsory blood draws conducted for law-enforcement purposes under the Fourth Amendment. 384 U.S. 757, 758-59, 86 S.Ct. 1826, 1829-30, 16 L.Ed.2d 908 (1966). The Supreme Court held that a warrantless blood draw constituted a search and seizure under the Fourth Amendment. *Id.* at 767, 86 S.Ct. at 1834. The *Schmerber* Court then outlined a two-part test for determining the legality of a blood draw, which included the following: (1) "whether the police were justified in requiring [Schmerber] to submit to a blood test"; and (2) "whether the means and procedures employed in taking [Schmerber's] blood respected relevant Fourth Amendment standards of reasonableness." *Id.* at 768, 86 S.Ct. at 1834.

According to *Schmerber*, the second part of the analysis contains two discrete questions: (1) whether the test chosen was reasonable or, in other words, whether the "means" employed were reasonable; and (2) whether "the test was performed in a reasonable manner" or, in other words, whether the "procedures" employed were reasonable. *Id.* at 771, 86 S.Ct. at 1836. With regard to the first part of the analysis, the *Schmerber* Court noted that blood tests are "a highly effective means of determining the degree to which a person is under the influence of alcohol" and "a commonplace in these days of periodic physical examinations and experience teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." *Id.*

Ultimately, the *Schmerber* Court concluded that a blood draw performed by a physician in a hospital according to acceptable medical practice was conducted in a

reasonable manner. *Id.* But, *Schmerber* also stated the following:

> We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk or infection or pain.

*Id.* at 771-72, 86 S.Ct. at 1836.

Last year, the Court of Criminal Appeals addressed a compulsory blood draw conducted by a police officer, who was also a seasoned EMS provider, in the police station's blood-draw room. *Johnston v. State*, 336 S.W.3d 649, 651 (Tex. Crim. App. 2011). *Johnston* specifically noted that "[t]hough a medical environment may be ideal, it does not mean that other settings are unreasonable under the Fourth Amendment," and "[a]ccording to our research, reasonableness depends on whether the environment is a safe place in which to draw blood." *Id.* at 662. In *Johnston*, the court concluded that a room inside the Dalworthington Gardens police station was a safe place to draw blood and that the statutory requirement that blood be drawn in a sanitary place was satisfied. *Id.* In arriving at their conclusion, the *Johnston* court noted that the evidence included a description of the room as "clean, but not sterile," with furniture that "could be cleaned with a commercial sanitizer before each use." *Id.* at 652.

*Johnston* also stated that police officers act reasonably when drawing blood if they act in accordance with accepted medical practices, including the equipment and technique that they employ. *Id.* at 663. Moreover, searches justified by a valid warrant have a presumption of legality unless the opponent produces evidence rebutting the

presumption of proper police conduct. *Amador v. State*, 221 S.W.3d 666, 672 (Tex. Crim. App. 2007). "[T]he reasonableness of the manner in which a DWI suspect's blood is drawn should be assayed on an objective, case-by-case basis in light of the totality of the circumstances surrounding the draw." *Johnston*, 336 S.W.3d at 661. Additionally, "reasonableness [of the environment] depends upon whether the environment is a safe place in which to draw blood." *Id.* at 662.

Martin challenges the second part of the analysis—the reasonableness of the manner of the blood draw. Specifically, Martin's argument hinges on Early's testimony that the room was "relatively" sanitary. He contends that this testimony demonstrates that the room was not sanitary; thus, the manner of the blood draw was unreasonable. We disagree.

Early, a licensed vocational nurse since 1999, testified that he drew Martin's blood in the intoxilyzer room at the Johnson County Law Enforcement Center. The State offered a "Specimen Routing Report" into evidence, which indicated that the blood draw was conducted at 2:39 a.m. on February 25, 2009. In drawing the blood, Early utilized a "sterile technique," which he described as using gloves and a vacutainer (an adapter attached to the needle used to draw blood). He also used an iodine-based cleansing solution and a specialized arm board for the blood draw and he is confident that he followed established medical procedures for a "good blood draw in this case." *See id.* at 663 (stating that police officers act reasonably when drawing blood if they act in accordance with accepted medical practices, including the equipment and technique that they employ).

With regard to the room used for the blood draw, Early testified that the room was "relatively" sanitary, though he noted that he would not "eat off the floor" of the room. Early also acknowledged that he was not responsible for cleaning the room and that he did not know when the last time the room was cleaned. Despite this testimony, Early later clarified that he thought the room was "sanitary enough to draw blood in." *See id.* at 652, 662 (noting that room where defendant's blood was drawn was "clean, but not sterile" and "could be cleaned with a commercial sanitizer before each use" and that reasonableness of environment "depends upon whether the environment is a safe place in which to draw blood"). And, in overruling Martin's objection, the trial court clearly believed Early's testimony that the intoxilyzer room was "sanitary" and a safe place to draw blood. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (stating that factfinder is entitled to judge credibility of witnesses and can choose to believe all, some, or none of the testimony); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

Based on the totality of the circumstances, the trial court could have concluded in its discretion that Martin's blood was drawn in a safe environment. Thus, we cannot say that the manner in which the blood draw was conducted was unreasonable. Accordingly, we hold that the requirements of the Fourth Amendment were met and that the trial court did not abuse its discretion in overruling Martin's objection on this ground. Martin's first issue is overruled.

Martin v. State                                                                                          Page 7

In his second issue, Martin asserts that the punishment imposed is excessive and disproportionate because no injuries resulted from the accident, his blood-alcohol level was "only .03 over the legal limit in Texas," and several mitigating factors were presented during the punishment phase.

Generally, a sentence within the statutory range of punishment for an offense is not excessive, cruel, or unusual punishment. *See Winchester v. State*, 246 S.W.3d 386, 389 (Tex. App.—Amarillo 2008, pet. ref'd); *Alvarez v. State*, 63 S.W.3d 578, 580 (Tex. App.— Fort Worth 2001, no pet.). A narrow exception to this rule is recognized where a sentence is grossly disproportionate to the offense. *See Moore v. State*, 54 S.W.3d 529, 542 (Tex. App.—Fort Worth 2001, pet. ref'd); *see also Harmelin v. Michigan*, 501 U.S. 957, 1004-05, 111 S.Ct. 2680, 2707, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring); *Solem v. Helm*, 463 U.S. 277, 290-92, 103 S.Ct. 3001, 3010-11, 77 L.Ed.2d 637 (1983); *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992).

In conducting a proportionality analysis, we first make a threshold comparison of the gravity of the offense against the severity of the sentence. *Moore*, 54 S.W.3d at 542; *see Solem*, 463 U.S. at 290-91, 103 S.Ct. at 3010; *McGruder*, 954 F.2d at 316. If we determine that the sentence is grossly disproportionate to the offense, we must then compare the sentence received to sentences for similar crimes in this jurisdiction and sentences for the same crime in other jurisdictions. *Alvarez*, 63 S.W.3d at 581; *see Solem*, 463 U.S. at 291-92, 103 S.Ct. at 3010; *McGruder*, 954 F.2d at 316.

Martin was charged with "Driving While Intoxicated-Third or More." *See* TEX. PENAL CODE ANN. §§ 49.04(a), 49.09(b)(2). The indictment contained two felony-

enhancement paragraphs for two felony DWI's, both of which the jury found to be true. *See id.* As a result, the punishment range for this offense was twenty-five to ninety-nine years. *See id.* § 12.42(d) (West Supp. 2012). The jury imposed a sixty-year sentence, which falls well within the statutory punishment range. *See id.*

The evidence showed that Martin has numerous DWI convictions over the past twenty-two years. The State presented evidence of three prior misdemeanor DWI and three prior felony DWI convictions—offenses that Trooper Gillman testified are "safety concern[s]." Moreover, Martin has not shown how the sentence imposed in this case is grossly disproportionate to sentences imposed on others in the same jurisdiction and sentences imposed for the commission of the same crime in other jurisdictions. *See Alvarez*, 63 S.W.3d at 581; *see also Solem*, 463 U.S. at 291-92, 103 S.Ct. at 3010; *McGruder*, 954 F.2d at 316. We cannot say that the punishment was grossly disproportionate to the offense. Accordingly, Martin's second issue is overruled.

Having overruled both of Martin's issues, we affirm the judgment of the trial court.

REX D. DAVIS
Justice

Before Chief Justice Gray,
 Justice Davis, and
 Justice Scoggins
 (Chief Justice Gray concurs in the judgment with a note)*
Affirmed
Opinion delivered and filed August 9, 2012
Do not publish
[CRPM]

*(Chief Justice Gray concurs in the Court's judgment affirming the trial court's judgment of conviction. A separate opinion will not issue. He notes, however, that the first issue on appeal does not comport with the objection made at trial and, accordingly, he would not address the merits of the issue on appeal. There were two objections to the blood evidence at trial, both of which were made twice. 14 CR 56-58; 92. The blood evidence was objected to at trial on the basis that: 1) it was obtained as a result of an illegal stop; and 2) it was obtained in violation of § 274 of the Texas Transportation Code. On appeal the issue is that the manner of drawing the blood was unreasonable and, therefore, a violation of the Fourth Amendment. The legality of the stop is not questioned on appeal and the blood draw procedures in the Texas Transportation Code are only applicable if the blood is drawn without a warrant. Martin's blood was drawn pursuant to a warrant. With these comments, Chief Justice Gray concurs in the judgment only.).