**Opinion issued August 29, 2013**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-12-00395-CR

—————————————

**CARA DAWN GAMBINI, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 14**
**Harris County, Texas**
**Trial Court Case No. 1772383**

---

## MEMORANDUM OPINION

A jury convicted appellant Cara Dawn Gambini of the class B misdemeanor offense of driving while intoxicated. *See* TEX. PENAL CODE ANN. § 49.04 (West Supp. 2012). The trial court sentenced Gambini to a fine of $500 and confinement

for 180 days in the county jail, which was probated for 15 months on the condition of her serving five days in jail. In a single issue on appeal, Gambini challenges the trial court's denial of her motion to suppress the results of a compelled blood test.

We affirm.

## Background

Gambini was stopped for speeding. Although she denied having had anything to drink, the police officer smelled alcohol on her breath and conducted field sobriety tests. Based on the results of those tests, the officer concluded that Gambini had been driving while intoxicated, and he arrested her. At the police station, an officer took Gambini's fingerprints, smearing ink on the top of her hand in the process. Another officer gave Gambini the statutory warning informing her of her right to refuse to provide a breath or blood specimen and the consequences of such refusal.[1] Then he asked for her consent to provide a breath or blood sample. When Gambini refused to provide such samples, the officers obtained a search warrant to compel her to submit to a blood draw. The officers showed her

---

[1] *See* TEX. TRANSP. CODE ANN. § 724.015 (West Supp. 2012) (Information Provided by Officer Before Requesting Specimen). The officer also informed Gambini that she had the right to remain silent and to an attorney. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2005). Gambini told the officer that she wished to terminate the interview. Gambini's invocation of her right to remain silent is not at issue in this appeal.

2

the search warrant, but she refused to cooperate. The officers then forced her to sit in the blood draw chair and restrained her using straps on her arms and shoulders.

Jeff Carrico, a registered nurse, drew Gambini's blood using a venipuncture technique. Obtaining a quantity of blood sufficient for analysis required three separate attempts: in her left arm, her left hand, and finally her right arm. Police officers recorded the blood draw using cameras in the blood draw room. The recording shows that Carrico wore gloves, cleaned each draw site using a gauze pad to which a Betadine solution had been applied, and used a needle that had been sealed and removed from its package for the purpose of the blood draw. In addition, the recording shows Carrico taping Gambini's hand to the arm of the chair to keep it still.

However, the video also shows that at points before and during the procedure, Carrico used his gloved hand or hands to touch: his nose, mouth, and hair; Gambini's calf; and the restraining straps on the chair. Carrico also placed the glass end of the blood vials in his mouth. A police officer used his ungloved hand to pass Carrico a gauze pad, which was placed over the venipuncture site on Gambini's right arm.

Before trial, Gambini filed a motion to suppress the results of the analysis of the blood samples, arguing that the venipuncture blood draw was an unreasonable search and seizure because the techniques, procedures, and actions used to draw

3

her blood were not in accordance with acceptable medical practices, exposed her to an unreasonable risk of infection and pain, and were part of an assault.  She did not challenge the lawfulness of the search warrant or the reasonableness of the venipuncture test as a means of obtaining a blood sample.  Gambini later filed a supplement to the motion to suppress, further arguing that the iodine pads and "prep solution" used in her blood draw had been recalled, and thus exposed her to a "risk of infection and pain above and beyond that normally associated with the venipuncture blood" draws.

At the hearing on the motion to suppress, the judge reviewed the recording of the blood draw.[2]  The court heard arguments regarding a separate motion to suppress Gambini's statements invoking her right to remain silent, but the court denied her motion to suppress the results of the blood sample analysis without hearing any argument.  Later at the hearing, Gambini made a record including still images from the recording that showed Carrico using his gloved hand or hands to touch his nose, his mouth, and his hair, Gambini's calf, and the restraining straps on the chair.  Gambini also offered into evidence video stills of Carrico holding the vials in his mouth and the officer touching the gauze pad, as well as her recorded statement questioning whether the needle was sterile.

---

[2]  At trial only the video was played.  Pursuant to a pretrial ruling on a separate motion to suppress evidence not challenged on appeal, the trial court ordered the audio portions of the recording redacted for the jury.

4

At trial, Carrico testified about the procedure he used to obtain a sample of Gambini's blood. He explained how the blood is collected into vials by way of small tubes, connected to a "butterfly" needle with small handles that enable a nurse to use the needle without touching it. He testified that the vials were under vacuum pressure to assist with obtaining blood flow into the vial. He also said that the vials contain a preservative and that it is his habit to verify the expiration date before using one.

Carrico testified that there was nothing about Gambini's blood draw process that was not sanitary. He clarified that drawing blood is a clean but not sterile procedure. Carrico testified that the room where Gambini's blood was drawn was a sanitary place, which was "actually set up for blood draws." For example, he testified that the desk used for the blood draw area is cleaned with a disinfectant.

Carrico also said that Gambini's blood was drawn according to accepted medical standards and practices. He testified that the protocol requires that the skin be cleaned with antibacterial disinfectant, that the needle be held by the handle and not touched, and that the stopper to the collection vial be kept clean. He testified that all of those things were done in accordance with proper protocol. Carrico wore gloves (primarily to protect himself), cleaned Gambini's skin with a disinfectant to protect her from the risk of infection, and made sure that the tip of the needle stayed clean. He also explained that he rubs the skin with disinfectant

in a circular motion, so that dirt or "foreign debris is pushed to the outside," away from the venipuncture site.

On cross-examination, Carrico was questioned about having touched various objects with his gloved hand. He could not recall touching his nose, mouth, or hair, but he said, "[T]he end of the needle, which is the important part, is not touched by the gloved hand because I would not take the risk of sticking myself. That would be absurd." He testified that he did not handle the needle at any time during Gambini's blood draws. When asked about having used his mouth to hold the vials, he explained that it was the bottom of the vial that was in his mouth, that he had nowhere to put the vials because he was drawing blood from the arm that was not adjacent to the desk, and that he required two hands for the procedure, especially because Gambini had been belligerent during the process. When Gambini's counsel questioned him about the propriety of holding the vials in his mouth, he testified that the practice was commonplace.

Although Gambini's counsel attempted to question Carrico about his touching of her leg and the gauze pad used to cover the venipuncture site on her right arm, the trial court limited this line of questioning, saying it was not relevant.

W. Arnold, the assistant director of the police crime laboratory, testified after Carrico. He tested the blood samples that were taken from Gambini. After explaining the testing procedure, he testified that the sample showed a blood

6

alcohol concentration of 0.133. Outside the presence of the jury, the court and Gambini's counsel questioned Arnold about factors relating to the cleanliness of the blood draw that could have affected the result. The trial judge inquired whether an ingredient in the body lotion that Gambini claimed she used on her leg could have affected the result, in light of the fact that Carrico touched her leg with his gloved hand during the blood draw procedure. The court stated, "[Y]ou did a bill . . . on this stuff earlier; and I wanted to ask this gentleman about it just to make sure that I didn't rule the wrong way or that I'm ruling the right way." Arnold testified that it was not possible that lotion used on Gambini's skin could have affected her blood alcohol concentration.

The court further inquired about the effect on the blood alcohol concentration of the nurse placing either the tip or the glass end of the vial in his mouth, the presence of ink on the surface of the skin, and the use of recalled or expired iodine. Arnold testified that none of these things would affect the measured blood alcohol concentration. Gambini's counsel then asked a series of questions about how Carrico's actions in touching his hair or the straps on the chair may have affected the test results. The court then stated, "My motion to suppress rulings stand." The court also ruled that the questions asked outside the presence of the jury, which related to the motion to suppress, were irrelevant to the question

of Gambini's guilt or innocence, and her counsel would not be permitted to ask those questions before the jury.

Gambini testified, denying that she had consumed any alcoholic beverages on the night in question. She also said that she felt violated by the procedures used in obtaining her blood samples. She said, "I was just terrified and traumatized. I felt like I had just been invaded."

After both sides rested, Gambini argued that there was insufficient evidence to submit the charge to the jury because the blood test result was not based on a reliable blood draw. Gambini also requested a special charge based on her motion to suppress, arguing that the blood draw was not done in accordance with generally accepted medical procedures. Her attorney argued, "it's common knowledge that when somebody draws your blood that it's not correct procedure . . . for the person who is withdrawing the blood to put their hands to their nose, hands in their mouth, hand in their hair, to run their hand up a person's leg. I think that's quite obvious that that's the case." The court denied Gambini's requested special charge and, finding the evidence legally sufficient, submitted the question of her guilt or innocence to the jury. The jury found Gambini guilty, and the court assessed her punishment.

**Analysis**

In one issue, Gambini challenges the court's ruling on her motion to suppress the results of the blood test, arguing in this court that the blood draw subjected her to an unreasonable risk of pain and infection.

We review a ruling on a motion to suppress for an abuse of discretion. *Shepherd v. State,* 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and we review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, a trial court may choose to believe or to disbelieve all or any part the testimony of a witness. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When, as in this case, the trial court makes no explicit findings of fact, we imply fact findings that support the trial court's ruling so long as the evidence supports the implied findings. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). Although we generally limit our review to evidence adduced at the suppression hearing, when the parties consensually relitigate the issue at trial, we also consider relevant trial testimony. *Rachal v. State*, 917

9

S.W.2d 799, 809 (Tex. Crim. App. 1996). Therefore, we must determine if the parties consensually relitigated the suppression issue at trial.

In *Rachal*, the defendant moved to suppress a pretrial statement on the grounds that it was coerced. 917 S.W.3d at 808. The defendant argued that an officer had threatened him while the two were alone. *Id.* The officer who allegedly threatened the defendant did not testify at the suppression hearing, but he did testify at trial. *Id.* at 808–09. At trial, the officer testified, without objection, that the defendant had "offered his confession without duress, coercion, threat, or unlawful inducement." *Id.* at 809. The Court of Criminal Appeals held that the parties had consensually relitigated the issue during trial. *Id.* The Court stated: "[When] the State raises the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate in our review." *Id.*

Here, Nurse Carrico did not testify at the pretrial hearing on Gambini's motion to suppress, but the State called him during its case in chief, and he testified that the blood draw was done in accordance with medical procedure and in a clean manner. Gambini questioned him about the cleanliness of the blood draw procedure on cross-examination. Thus, as in *Rachal*, it is appropriate for us to

10

consider the trial testimony in our review of the trial court's ruling on the motion to suppress. *See id.*[3]

A compelled blood draw constitutes a search and seizure under the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 758–59, 86 S. Ct. 1826, 1829 (1966); *see Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013). The United States Supreme Court has adopted a two-part test for determining the legality of a blood draw. *See Schmerber*, 384 U.S. at 768, 86 S. Ct. at 1834. A compelled blood draw is permissible under the Fourth Amendment if the police were justified in requiring the suspect to submit to a blood test, and if the means and procedures used to obtain the suspect's blood were reasonable *Id.*; *see State v. Johnston*, 336 S.W.3d 649, 658 (Tex. Crim. App. 2011). In *Schmerber*, the Supreme Court held that blood extraction was a reasonable means of determining the defendant's blood alcohol level because it was commonplace, highly effective, and involved minimal or "virtually no risk, trauma, or pain." *Id.* at 771, 86 S. Ct. at 1836. *Schmerber*

---

[3] The State argues on appeal that Gambini's issue is not preserved because her written motion to suppress was general and she did not make the same arguments at the hearing on the motion to suppress as she does on appeal. Specifically, the State contends that there was no evidence the trial judge knew of or evaluated the facts pertaining to the cleanliness of the environment or the nurse's actions in denying Gambini's motion to suppress. In addition to our holding above that the State consensually relitigated the issue of the cleanliness of the blood draw and the nurse's actions, we also observe that, outside the presence of the jury, the trial court asked searching questions of the laboratory manager pertaining to issues of cleanliness of the blood draw and the nurse's actions. The court expressly stated its purpose for doing so was to verify that it had been correct in denying Gambini's motion to suppress.

also held that the test was performed in a reasonable manner because the defendant's blood was drawn by a physician in a hospital environment and according to accepted medical practices. *Id.*

In *State v. Johnston*, 336 S.W.3d 649 (Tex. Crim. App. 2011), the Court of Criminal Appeals held that "there is a presumption that venipuncture blood-draw tests are reasonable under the Fourth Amendment," and that "each suspect bears the burden of showing that a venipuncture blood draw is not a reasonable means to obtain a blood alcohol level assessment as to him or her, individually." *Id.* at 659–60. *Johnston* also held that a medical environment is not required to satisfy the reasonable procedures test. *Id.* at 662. Nor is it required that the blood draw be performed by a physician. *Id.* Rather, a blood draw may be conducted in accordance with accepted medical practices in an environment that is a safe place in which to draw blood. *Id.* at 662–63.

Gambini's argument is that the procedures used to take her blood were unreasonable, but this argument is not supported by the evidence. Gambini argues that the fact that Carrico touched his nose, mouth, and hair, as well as Gambini's leg and the straps on the chair, rendered the procedure unclean and exposed her to an unreasonable risk of pain and infection. At trial Carrico testified that the procedure he used, which was shown in the video, was done in accordance with standard medical practices. The blood draw was conducted in a clean, but not

12

sterile, room. Carrico wore gloves, cleaned Gambini's skin with an antibacterial disinfectant, held the needle by the handle, and kept the stopper side of the vial clean. There was no evidence introduced that Carrico's actions of touching things with his gloved hands exposed Gambini to an unreasonable risk of pain or infection. To the contrary, Carrico's testimony refuted that defensive theory. Accordingly, we hold that the trial court did not abuse its discretion by denying the motion to suppress. We overrule Gambini's sole issue.

## Conclusion

We affirm the judgment of the trial court.


Michael Massengale
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).

13